# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

———————

No. 05-3910

———————

Crystal Gregory; Alberta Turner; Carla   *
Turner; Treva Gage; Debra Hamilton;   *
Capria Lee; Antwinette Avery; Jeff     *
McKinney; Arnel Monroe; Michael    *   Appeal from the United States
Richmond; Maren Snell; Felicia Turner; *   District Court for the
Michael Warrick; Lashanda Wisham;   *   Western District of Missouri.
Cecilia Young,                    *
                                *
         Appellants,       *
                                *
   v.                      *
                                *
Dillard's, Inc.,           *
                                *
         Appellee.       *

———————

Submitted: April 16, 2008
Filed: May 12, 2009

———————

Before LOKEN, Chief Judge, WOLLMAN, MURPHY, BYE, RILEY, MELLOY, SMITH, COLLOTON, GRUENDER, BENTON, and SHEPHERD, Circuit Judges.

———————

COLLOTON, Circuit Judge.

Thirteen African-Americans appeal the decisions of the district court[1] dismissing their claims against Dillard's, Inc., based on alleged race discrimination at the Dillard's department store in Columbia, Missouri. We affirm the district court's dismissal of the plaintiffs' claims under 42 U.S.C. § 1981, and remand with directions to modify the final judgment so as to dismiss the plaintiffs' claims under the Missouri Human Rights Act without prejudice.

I.

In July 2002, plaintiffs Crystal Gregory, Alberta Turner, and Carla Turner filed their original complaint, alleging that Dillard's violated 42 U.S.C. § 1981 by discriminating on the basis of race in the making and enforcement of contracts on specific occasions in 2001 and 2002. The complaint alleged that Dillard's actions also constituted discrimination on the basis of race in a place of public accommodation, in violation of the Missouri Human Rights Act ("MHRA"), Mo. Rev. Stat. § 213.065. The complaint was amended three times, once for the purpose of asserting allegations on behalf of a class, and later to add fourteen more individual plaintiffs, for a total of seventeen.[2] In October 2004, the district court denied the plaintiffs' request to certify a class pursuant to Federal Rule of Civil Procedure 23.[3]

_____

[1]The Honorable Scott O. Wright, United States District Judge for the Western District of Missouri.

[2]The fourteen new plaintiffs were Treva Gage, Debra Hamilton, Capria Lee, Antwinette Avery, Jeff McKinney, Arnel Monroe, Michael Richmond, Maren Snell, Felicia Turner, Michael Warrick, LaShanda Wisham, Cecilia Young, Michael Butler, and Deidre Golphin. Butler and Golphin did not appeal, and Avery and Young withdrew from the appeal after it was filed, thus leaving a total of thirteen appellants.

[3]The third amended complaint sought to assert class-wide claims in three areas, described by the district court as "(1) surveillance/hostile shopping environment, (2) returns and exchanges, and (3) check-writing." As to the first area, the court concluded that none of the named plaintiffs had been "denied" an opportunity to

In January 2005, the district court granted Dillard's motion to dismiss the claims of eleven plaintiffs under § 1981. The court observed that these plaintiffs "tersely allege" that they "have each experienced, within the time period of 1998 to the present, instances at Dillard's Columbia, Missouri, store in which they were followed and/or otherwise subjected to surveillance based upon their race." Order, R. Doc. 159, at 2. Relying on *Garrett v. Tandy Corp.*, 295 F.3d 94 (1st Cir. 2002), where the court held that "[s]o long as watchfulness neither crosses the line into harassment nor impairs a shopper's ability to make and complete purchases, it is not actionable under section 1981," *id.* at 101, the district court ruled that the failure of the eleven plaintiffs to allege "that they were questioned, searched, detained, or subjected to any physical activity other than being followed or subjected to surveillance" was fatal to their claims. Order, R. Doc. 159, at 3-4. The court reasoned that "[b]ecause Section 1981 requires a *per se* interference with plaintiffs' ability to contract, and because plaintiffs have failed to allege facts demonstrating a *per se* interference," the motion to dismiss should be granted. *Id.*

In July 2005, the district court considered motions for summary judgment with respect to the remaining plaintiffs, including Gregory, the Turners, and Jeff McKinney.[4] As to Gregory and the Turners, the court concluded that except for one

_____

make purchases at Dillard's, and that whether particular plaintiffs had been "deterred" or "discouraged" from making a purchase required individualized fact-finding that made class certification improper. With respect to claims pertaining to returns and exchanges, the court determined that there was "no evidence" that any discriminatory actions of Dillard's employees was "the result of an official or de facto company policy," and that the proposed class thus failed the commonality requirement of Rule 23(a)(2). As to claims pertaining to check-writing, the court determined that only one plaintiff asserted a check-writing claim, and that this claim was "borderline-frivolous." The court thus found insufficient evidence that the plaintiffs could satisfy the numerosity requirement of Rule 23(a)(1).

[4]The court also considered and dismissed a claim brought by Cecilia Young, who has withdrawn her appeal. Another plaintiff, Deirdre Golphin, voluntarily

claim raised by Gregory, all of the claims asserted by these plaintiffs amounted to "discriminatory surveillance." *Gregory v. Dillard's, Inc.*, No. 02-04157, 2005 WL 1719960, at *8 (W.D. Mo. July 22, 2005). Citing authority that "[d]iscriminatory surveillance . . . on its own [is] not actionable under § 1981," *Hampton v. Dillard's, Inc.*, 247 F.3d 1091, 1109 (10th Cir. 2001), the court granted summary judgment for Dillard's on these claims. The district court opined that "[a]llowing the Turners and Gregory to proceed on a theory of discriminatory surveillance 'would come close to nullifying the contract requirement of Section 1981 altogether, thereby transforming the statute into a general cause of action for race discrimination in all contexts.'" *Gregory*, 2005 WL 1719960, at *8 (quoting *Lewis v. J.C. Penney Co.*, 948 F. Supp. 367, 371-72 (D. Del. 1996)). On Gregory's remaining claim that a Dillard's employee once refused to let Gregory walk through the store while carrying a bedding set that she had purchased on an earlier date, the court concluded that Gregory presented no evidence that she intended or attempted to purchase merchandise on the day of the incident, and that she therefore failed to demonstrate an interference with an actual contractual interest or relationship.

The district court granted summary judgment in favor of Dillard's on McKinney's claim under § 1981. Observing that McKinney made no attempt to purchase merchandise, and that he left the store voluntarily after being subjected to what he believed to be rude behavior, the court ruled that because McKinney chose to leave the store of his own accord, Dillard's could not be liable under § 1981. *Gregory*, 2005 WL 1719960, at *8 (citing *Bagley v. Ameritech Corp.*, 220 F.3d 518, 521-22 (7th Cir. 2000)). The court further held that a 15-minute delay endured by McKinney while waiting for service from a Dillard's store clerk was insufficient to sustain a § 1981 claim.

withdrew her claims, and they were dismissed with prejudice on stipulation of the parties. The district court denied Dillard's motion for summary judgment as to the claim of Michael Butler. Butler and Dillard's later reached a settlement, and Butler's claim was dismissed with prejudice.

As to the state-law claims under the MHRA, the district court observed that the Missouri statute prohibits discrimination on the basis of race in "any place of public accommodation." Mo. Rev. Stat. § 213.065. After analyzing the statutory definition of "places of public accommodation," *id*. § 213.010(15), the district court concluded that the phrase does not include retail establishments. On that basis, the court dismissed the plaintiffs' claims against Dillard's under the MHRA.

II.

We first consider the claims arising under federal law. Section 1981 provides that all persons within the jurisdiction of the United States shall have "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). First enacted in 1866, the statute was amended in 1991 to define "make and enforce contracts" to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id*. § 1981(b).

While § 1981 prohibits racial discrimination in "all phases and incidents" of a contractual relationship, *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 302 (1994), the statute "does not provide a general cause of action for race discrimination." *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001). Rather, the 1991 amendments retained the statute's focus on contractual obligations. *Id.* Congress "positively reinforced that element by including in the new § 1981(b) reference to a '*contractual relationship*.'" *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 477 (2006) (emphasis in original). "Any claim brought under § 1981, therefore, must initially identify an impaired 'contractual relationship' under which the plaintiff has rights." *Id*. at 476; *accord Youngblood*, 266 F.3d at 855. Section 1981 is not, however, limited to existing contractual relationships. The statute "protects the would-be contractor along with those who already have made contracts," *Domino's Pizza*, 546 U.S. at 476, and it thus applies to discrimination that

-5-

"blocks the creation of a contractual relationship" that does not yet exist. *Id*.; *see Runyon v. McCrary*, 427 U.S. 160, 172 (1976).

Our court has identified several elements to a claim under § 1981, which we divide into four parts for analysis: (1) membership in a protected class, (2) discriminatory intent on the part of the defendant, (3) engagement in a protected activity, and (4) interference with that activity by the defendant. *See Green v. Dillard's, Inc.*, 483 F.3d 533, 538 (8th Cir. 2007); *Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004). The disputed issues in this appeal are elements (3) and (4). There is no dispute that the plaintiffs are members of a protected class, and while Dillard's disputes that it acted with any racial animus, it does not urge dismissal of the claims on the ground that the plaintiffs failed to allege or present a disputed issue of fact concerning discriminatory intent.[5] We focus, therefore, on whether each

---

[5]In connection with the motion for summary judgment, the plaintiffs presented evidence from several witnesses to support their allegation that Dillard's acted with discriminatory intent. Theresa Cain, a Dillard's employee from September 1999 to October 2000, averred in an affidavit that "other Dillard's employees often stereotyped African American customers as likely shoplifters," that she "regularly observed security officers and sales clerks watching and/or following African-American customers for no reason except that the customers were African American," and that "Dillard's security officers so focused their surveillance on African American customers to the exclusion of Caucasian customers that on numerous occasions [she] observed Caucasian customers openly shoplift items without being noticed by store security." Appellants' App. 163. Maren Snell, who worked at the store in 2001, testified that she saw store employees ask for receipts from black customers seeking to return merchandise, but that white customers were not asked for receipts. *Id*. at 187. Tammy Benskin, an employee from 1997 to 1998, testified that the store's security code – directing staff to be "on the lookout" – was announced over the employee intercom "ninety percent more" when African Americans entered the store than when non-African Americans entered. Benskin saw the store manager follow African Americans around the store, but could not recall seeing him follow non-African Americans. *Id*. at 131-33. Kenneth Gregory, husband of a plaintiff, worked at Dillard's as a security guard during 1995, 1997, and 1998. Gregory

plaintiff engaged in protected activity and whether Dillard's interfered with such activity.[6]

To show protected activity, the third element, a plaintiff alleging interference with the creation of a contractual relationship in the retail context must demonstrate that he or she "actively sought to enter into a contract with the retailer," and made a "tangible attempt to contract." *Green*, 483 F.3d at 538 (quoting *Morris v. Dillard*

---

testified that he once followed a white man in the store on suspicion that he intended to shoplift a hat, but the store manager stopped and questioned the man before he exited the store, and the man left without the hat. Gregory concluded that the manager would not have stopped a similarly-situated black person, but would have allowed him to leave the store and face arrest. *Id*. at 141-43. Another former employee, Roderick Beasley, testified that he witnessed what he believed was discrimination when he worked at the store from 1996 to 1999. Beasley identified two employees, saying that he "wouldn't call them racists," but that "maybe they had tendencies to watch folks that should not [sic]." *Id*. at 153. Beasley said that the employee behavior was "systematic," and "if it's not brought to [the store manager's] attention with credible evidence, he can't do anything about it." *Id*. at 155. For a record-based discussion of other facts recounted by the principal dissent, *post*, at 30-32, see *Gregory v. Dillard's, Inc.*, 494 F.3d 694, 714 n.7, 722 n.8 (8th Cir. 2007) (dissenting opinion), *vacated and reh'g en banc granted*.

[6]At oral argument, plaintiffs suggested that each plaintiff need not satisfy each element of a § 1981 claim, and that the court should "lump them together" when analyzing the sufficiency of the evidence presented. We reject the notion that Dillard's may be liable under § 1981 based on a hypothetical composite plaintiff even if it did not unlawfully interfere with the right of any individual to make or enforce a contract. Indeed, the district court refused to certify a class action in this case precisely because the claims of the various plaintiffs required individual fact-finding on the interference element of § 1981, and the plaintiffs have not appealed that ruling. *Cf. Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998) ("[C]ourts considering class certification must rigorously apply the requirements of Rule 23 to avoid the real risk, realized here, of a composite case being much stronger than any plaintiff's individual action would be.").

*Dep't Stores, Inc.*, 277 F.3d 743, 752 (5th Cir. 2001)). In view of the statute's focus on protecting a contractual relationship, a shopper advancing a claim under § 1981 must show an attempt to purchase, involving a specific intent to purchase an item, and a step toward completing that purchase. *See Green*, 483 F.3d at 538 (holding that shopper satisfied third element by selecting a specific item in display case and communicating to sales clerk her desire to purchase that item); *Denny v. Elizabeth Arden Salons, Inc.*, 456 F.3d 427, 435 (4th Cir. 2006) (holding that plaintiffs who had purchased and received a gift package entitling the recipient to a variety of salon services had demonstrated a contractual relationship); *Williams v. Staples, Inc.*, 372 F.3d 662, 668 (4th Cir. 2004) (holding that the plaintiff sought to enter a contractual relationship when he offered payment by check); *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 874 (6th Cir. 2001) (holding that a plaintiff who had selected merchandise for purchase by placing it in her cart, had the means to purchase, and would have purchased the merchandise had she not been asked to leave the store had shown a sufficient contractual relationship to bring a § 1981 claim); *cf. McQuiston v. K-Mart Corp.*, 796 F.2d 1346, 1348 (11th Cir. 1986) (holding that when a customer lifts an item from a shelf or rack to determine its price, there is no contractual relationship with the seller).

To the extent that the plaintiffs urge us to expand our interpretation of the statute beyond the elements stated in *Green*, and to declare that a shopper need only enter a retail establishment to engage in protected activity under § 1981, we decline to do so. The Tenth Circuit in *Hampton* addressed a comparable contention that § 1981 "protects customers from harassment upon entering a retail establishment." 247 F.3d at 1118. Stating that it could not "extend § 1981 beyond the contours of a contract," the *Hampton* court rejected the claim of a plaintiff who failed "to make or attempt to make a purchase" at a department store. *Id.* In reaching this conclusion, the court found itself "aligned with all the courts that have addressed the issue" in requiring that "there must have been interference with a contract beyond the mere expectation of being treated without discrimination while shopping." *Id.* (citing

*Wesley v. Don Stein Buick, Inc.*, 42 F. Supp. 2d 1192, 1201 (D. Kan. 1999); *Sterling v. Kazmierczak*, 983 F. Supp. 1186, 1192 (N.D. Ill. 1997); *Lewis v. J.C. Penney Co.*, 948 F. Supp. 367, 371 (D. Del. 1996)); *see also Morris v. Office Max, Inc.*, 89 F.3d 411, 413-15 (7th Cir. 1996) (upholding dismissal of a claim brought by two shoppers who were examining time stamps and discussing the advantages and disadvantages of three or four models when they were approached by police, because interference with "prospective contractual relations" was insufficient to state a claim under § 1982, which is "construed in tandem" with § 1981).  We agree with this analysis.

To demonstrate unlawful interference by a merchant under § 1981, the fourth element, a plaintiff must show that the retailer "thwarted" the shopper's attempt to make a contract.  *Green*, 483 F.3d at 539.  By "thwart," we mean that interference is established where a merchant "blocks" the creation of a contractual relationship.  *Domino's Pizza*, 546 U.S. at 476.  This element is satisfied, for example, where a retailer asks a customer to leave a retail establishment in order to prevent the customer from making a purchase.  *Christian*, 252 F.3d at 873.  In *Green*, our court held that where a sales clerk "explicitly refused service" to two shoppers based on race, "treated them at all times with pronounced hostility," "discouraged her coworker from assisting them by questioning their ability to pay," directed "a most egregious racial slur" and "forceful racial insult" at the shoppers,[7] and "actively hindered" the efforts of another sales clerk to serve the customers, the plaintiffs had shown conduct sufficiently severe to constitute actionable interference.  483 F.3d at 539.

Several courts have concluded, however, that not all conduct of a merchant that offends a customer is sufficient to constitute actionable interference with a contractual relationship for purposes of § 1981.  The Fifth Circuit, for example, has

---

[7]After one of the customers in *Green* presented his identification and credit cards, identified himself as a police officer, and expressed desire to make a purchase, the sales clerk "stepped back and said, 'Fucking niggers' and stalked off."  483 F.3d at 535.

held that where a shopper abandoned his purchase due to a merchant's mistreatment of the shopper's daughter, the merchant did not "actually interfere" with or "thwart" an attempted purchase in a manner that violated § 1981. *Arguello v. Conoco, Inc.*, 330 F.3d 355, 358-59 (5th Cir. 2003). In that circuit, "a § 1981 claim must allege that the plaintiff was *actually prevented, and not merely deterred*, from making a purchase or receiving a service after attempting to do so." *Id.* (emphasis in original) (internal quotations omitted); *accord Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d at 752-53; *see Henderson v. Jewel Food Stores, Inc.*, No. 96 C 3666, 1996 WL 617165, at *3-4 (N.D. Ill. Oct. 23, 1996).

The Seventh Circuit similarly has held that where a shopper opts not to contract with a merchant because the shopper is offended by certain racially motivated activity of an employee of the store, there is no claim under § 1981. In *Bagley v. Ameritech Corp.*, 220 F.3d 518 (7th Cir. 2000), a customer left a store after he was offended by the behavior of an assistant sales manager, who said she "would not serve" the customer and "gave him the finger." *Id.* at 520. The court held that while it could not fault the customer for taking offense, this offensive conduct was insufficient to state a claim under § 1981, because the merchant was "not responsible for terminating the transaction." *Id.* at 522.

In particular, we agree with two other circuits that discriminatory surveillance by a retailer is insufficient to establish interference with protected activity under § 1981. The First Circuit, observing that "[i]n a society in which shoplifting and vandalism are rife, merchants have a legitimate interest in observing customers' movement," held that an allegation of discriminatory surveillance is insufficient to state a claim under § 1981. *See Garrett*, 295 F.3d at 101. The Tenth Circuit reached the same conclusion, stating that "discriminatory surveillance" is "not actionable

under § 1981." *Hampton*, 247 F.3d at 1108. Racially biased watchfulness, however reprehensible, does not "block" a shopper's attempt to contract.[8]

Judge Murphy's dissent, by contrast, advocates an expansive interpretation of § 1981 that acknowledges no limiting principle on actionable interference in the retail shopping context, such that virtually any case in which there is a disputed issue regarding the merchant's motivation would be submitted to a jury. Indeed, the dissent's rationale does not exclude the possibility that even surveillance unknown to a shopper constitutes actionable interference. *Post*, at 44 n.18. This approach not only conflicts with the decisions of several circuits, but it is inconsistent with the dissent's own purported adherence to the standard established in *Green*.

---

[8]In opposition to *Garrett* and *Hampton*, Judge Murphy's dissent relies on a thirty-one year-old decision of the Third Circuit in *Hall v. Pennsylvania State Police*, 570 F.2d 86 (3d Cir. 1978). The court in *Hall* held that a § 1981 claim withstood a motion to dismiss where the plaintiff alleged that the State of Pennsylvania, with the cooperation of a bank, initiated a program to photograph "suspicious-looking blacks" who entered the bank, and to preserve the photographs for unlawful purposes. *Id*. at 88. The Third Circuit reasoned that the allegations set out a cognizable claim against the bank under § 1981, because the plaintiff's "photograph was taken for the police by bank employees pursuant to a racially based surveillance scheme," and the bank allegedly had adopted a policy "to offer its services under different terms dependent on race." *Id*. at 92. The court framed the issue as one involving "contractual customers," *id*., and it thus appears that the plaintiff already had a contractual relationship with the bank before he entered to transact business and was photographed. The court did not hold that the alleged photography program blocked the creation of a contractual relationship, *see Domino's Pizza*, 546 U.S. at 476, such that it interfered with the plaintiff's equal right to make contracts. We find the brief discussion in *Hall* inapposite to the claims of retail shoppers in this case.

III.

A.

Turning to the specific claims at issue in this appeal, the district court resolved nine of them on a motion to dismiss, holding that an allegation of discriminatory surveillance alone was insufficient to state a claim under § 1981. We review the district court's decision *de novo*. *Carter v. Arkansas*, 392 F.3d 965, 968 (8th Cir. 2004).

The complaint in this case involved seventeen plaintiffs, thirteen of whom have appealed. In the complaint, each plaintiff made a summary allegation that he or she had "sought to make and enforce a contract for services ordinarily provided by Dillard's," and had been "deprived of services" while similarly-situated white persons were not, or had received services "in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory." Appellants' App. 50-85. To explain the grounds on which their claims rested, plaintiffs Crystal Gregory, Alberta Turner, and Carla Turner included factual allegations concerning their shopping experiences at Dillard's, and alleged that employees of Dillard's had taken certain actions based on race in those instances that gave rise to liability under § 1981. In sharp contrast to Gregory and the Turners, the nine appellants considered on the motion to dismiss alleged in their factual section of the complaint only that "each experienced . . . instances at Dillard's Columbia, Missouri store in which they were followed and/or otherwise subjected to surveillance based upon their race." Appellants' App. 50.[9]

---

[9]The section of the complaint on "jurisdiction and venue" alleged that the plaintiffs had been "deterred from making shopping purchases, impaired in their ability to make shopping purchases, and/or deprived of services enjoyed by non-minorities because of defendant's racial profiling, following, harassing, and engaging in other acts designed to directly or indirectly refuse or withhold services from

-12-

Even before the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), we held that a civil rights complaint "must contain facts which state a claim as a matter of law and must not be conclusory." *Frey v. City of Herculaneum*, 44 F.3d 667, 671 (8th Cir. 1995); *see also Nickens v. White*, 536 F.2d 802, 803 (8th Cir. 1976). *Twombly* confirmed this approach by overruling *Conley v. Gibson*, 355 U.S. 41 (1957), and establishing a plausibility standard for motions to dismiss. 127 S. Ct. at 1966. After *Twombly*, we have said that a plaintiff "must assert facts that affirmatively and plausibly suggest that the pleader has the right he claims . . . , rather than facts that are merely consistent with such a right." *Stalley v. Catholic Health Initiative*, 509 F.3d 517, 521 (8th Cir. 2007); *see Wilkerson v. New Media Tech. Charter Sch.*, 522 F.3d 315, 321-22 (3d Cir. 2008). While a plaintiff need not set forth "detailed factual allegations," *Twombly*, 127 S. Ct. at 1964, or "specific facts" that describe the evidence to be presented, *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (per curiam), the complaint must include sufficient factual allegations to provide the grounds on which the claim rests. *Twombly*, 127 S. Ct. at 1965 n.3. A district court, therefore, is not required "to divine the litigant's intent and create claims that are not clearly raised," *Bediako*, 354 F.3d at 840, and it need not "conjure up unpled allegations" to save a complaint. *Rios v. City of Del Rio*, 444 F.3d 417, 421 (5th Cir. 2006) (internal quotation omitted).

African American customers who enter Dillard's." Appellants' App. 33. Because this section refers to all plaintiffs and uses the "and/or" formulation, it does not connect any particular plaintiff to any particular allegation. A section of the complaint asserting "class action allegations" similarly uses "and/or" within a series of allegations and refers to "one or more" actions taken by Dillard's without specifying which action or actions allegedly apply to which plaintiff or plaintiffs. *See generally Ollilo v. Clatskanie Peoples' Util. Dist.*, 132 P.2d 416, 419 (Or. 1942) (observing that the use of "and/or" "generally tends toward confusion" and describing "and/or" as "a sort of verbal monstrosity which courts have quite generally condemned").

In this case, the nine motion-to-dismiss appellants did spell out the limited factual basis for their claims. The grounds upon which their claims rest is an assertion that Dillard's caused them to be followed and surveilled while they were in the store. Appellants' App. 50. This factual allegation fails to state a claim. Absent an allegation that the plaintiffs attempted to purchase merchandise, the complaint fails to meet the foundational pleading requirements for a suit under § 1981, because it does not satisfy the third element that the plaintiffs attempted to make a contract. Protected activity under the statute does not extend to "the mere expectation of being treated without discrimination while shopping." *Hampton*, 247 F.3d at 1118; *accord Garrett*, 295 F.3d at 101.

Nor does the complaint allege sufficient interference with asserted protected activity to state a claim under the fourth element. An allegation of discriminatory surveillance is insufficient to state a claim under § 1981. *See Garrett*, 295 F.3d at 101; *Hampton*, 247 F.3d at 1108. We believe that the district court's reference to "*per se* interference" – made when applying *Garrett* and discussing the claims of plaintiffs who had not alleged anything "other than being followed or subjected to surveillance" – was simply another way of expressing the same conclusion. We thus agree with the district court that these claims must be dismissed.

B.

The § 1981 claims of four other appellants were dismissed on a motion for summary judgment. We review the district court's decision *de novo*, drawing all reasonable inferences in favor of the plaintiffs without resort to speculation. *Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 810 (8th Cir. 2005). We conclude that the district court properly applied the law to the applicable facts, and that the grant of summary judgment should be affirmed.

As to appellant Jeff McKinney, we adopt the rationale of the three-judge panel that previously considered this claim. *See Gregory v. Dillard's, Inc.*, 494 F.3d 694, 708 (8th Cir. 2007) (Murphy, J.). McKinney and his cousins had sampled cologne testers while waiting for sales assistance. Although McKinney believed he had previously made eye contact with the sales associate who subsequently moved the cologne testers, there is no evidence that McKinney ever communicated a desire to make a purchase as opposed to testing samples, *cf. Green*, 483 F.3d at 538-39, spoke to the sales associate about any merchandise when she came to the counter where he and his cousins were standing, or had more than a "general interest" in the cologne. *Morris v. Office Max, Inc.*, 89 F.3d at 414. McKinney thus failed to present sufficient evidence of interference with a protected contract interest, and the district court correctly granted summary judgment for Dillard's on this claim. The expansive interpretation of § 1981 now advocated by the principal dissenting opinion leads Judge Murphy and Judge Melloy to dissent from their own panel opinion, *post*, at 40-41, but we adhere to their previous views.

Appellant Crystal Gregory presented evidence that a sales associate followed her as she selected a couple pairs of pants from a rack and took them to a fitting room at Dillard's. Gregory testified that when she came out of the fitting room, the sales associate had a "little smirk on her face," and that two officers were right outside the fitting room leaning on clothing racks. Appellants' App. 286. Gregory said she returned to the fitting room, removed the pants, and then took the pants to the counter, where the sales clerk was "getting ready to ring me up." *Id*. at 287. Gregory, however, was offended by the conduct of the sales associate, and she told the sales clerk that she was not buying the pants. Gregory testified that she then spoke with a manager, but concluded that "she was not of much help, almost as if she did not care, and so I left and I left very upset." *Id.* at 288. The record does not disclose what Gregory asked the manager to do, or what the manager offered to do.

The district court correctly concluded that this evidence does not establish interference with protected activity sufficient to prove the fourth element of a claim under § 1981. As discussed, evidence of surveillance or watchfulness is insufficient to state a claim. *Garrett*, 295 F.3d at 101; *Hampton*, 247 F.3d at 1108. In *Garrett*, for example, three employees monitored the plaintiff throughout his visit to a store, and "at least one of them accompanied him throughout his visit." 295 F.3d at 96. When the plaintiff later complained to a store manager about racially discriminatory treatment, the manager responded with "patently false" information. *Id.* at 97. Nonetheless, the *Garrett* court held that this active trailing of a minority shopper in the store amounted to no more than an "unadorned" – and legally insufficient – claim that the plaintiff was carefully watched while on the premises. *Id.* at 101. The addition of an inconsiderate smirk on the face of a Dillard's sales clerk, or Ms. Gregory's subjective belief that the store manager was "not of much help," does not meaningfully distinguish this case from *Garrett*, particularly where Gregory admits that Dillard's did not refuse to contract, but rather that a sales clerk was "getting ready to ring [her] up" when Gregory herself declared that she would not make a purchase. Appellant's App. 287.

The claims of Alberta and Carla Turner were properly dismissed for similar reasons. The Turners presented evidence that after Alberta purchased several pairs of shoes at the Dillard's store, she, Carla, and Carla's children began to examine clothing in the children's department. Carla took her daughter to a fitting room, and when she exited the room, a sales associate and a security guard were outside looking at them. Carla asked the security guard why he was following them, but received no answer. The security guard then followed Carla as she walked through the store to rejoin Alberta. As the two women approached the cash register, Alberta asked whether they really wanted to buy the clothes. Carla said that it was Alberta's decision, and Alberta said that she really did not think that she wanted to make the purchase. Upset by the surveillance, Alberta took the clothing items to the sales counter and told the clerk that she would not make a purchase. She then approached

the first sales associate and told her "you just made someone lose a sale," at which time the sales associate allegedly snickered and said, "So?" Appellants' App. 260a; Appellee's App. 170, 185. The Turners then left the store. Alberta returned shortly thereafter and told a manager that Dillard's management needed to let the employees know that "everybody who comes in here is not out to . . . take things from them." When the manager asked what had happened, Alberta said that she did not want to discuss it. Appellants' App. 260a.

As with Ms. Gregory's claim, the evidence presented by the Turners shows at most discriminatory surveillance and watchfulness, which is not actionable interference under § 1981. Dillard's also demonstrated its willingness to contract by selling shoes to Alberta Turner on the same visit, but the Turners nonetheless abandoned their effort to purchase children's clothing. On this record, the district court properly dismissed the claims. *See Arguello*, 330 F.3d at 358-59; *Garrett*, 295 F.3d at 101; *Bagley*, 220 F.3d at 521-22; *Morris v. Office Max, Inc.*, 89 F.3d at 414-15.[10]

---

[10]Judge Benton agrees with our conclusion, *supra*, at 12-14, that the plaintiffs' allegation that they were "followed and/or otherwise subjected to surveillance based upon their race" fails to state a claim under § 1981. His opinion, however, also "joins the dissenting opinion" with respect to the claims of Gregory and the Turners, and thus joins Judge Murphy's view that the merit of these claims "may be seen" by recognizing that the taking of photographs constitutes actionable interference with the right to make a contract. *Post*, at 43-44 & n.18 (relying on *Hall*, 570 F.2d at 92). With respect, we find these conclusions internally inconsistent.

Judge Benton also relies on language from the First Circuit's decision in *Garrett* to conclude that the alleged conduct of Dillard's involving Gregory and the Turners constitutes actionable interference, because the store's "active surveillance crossed the line into harassment and impaired their ability to make purchases." *Post*, at 21. *Garrett*, however, held that racially-motivated surveillance is not actionable "harassment" under § 1981, and the First Circuit has not defined what conduct it would view as actionable. In any event, as we have explained, *supra*, at 16, we do

We recognize that the plaintiffs were offended by the alleged conduct of Dillard's employees, but we do not believe the facts asserted here are sufficient to establish interference under § 1981. As noted, several courts have concluded that not all offensive conduct of a merchant constitutes actionable interference. *See Arguello*, 330 F.3d at 358-59 (holding no actionable interference where plaintiff voluntarily set product on counter and left without trying to buy it after sales clerk made racially derogatory remarks and mistreated plaintiff's daughter); *Garrett*, 295 F.3d at 101 (holding no actionable interference where plaintiff alleged that three employees monitored him throughout his visit to the store because of his race); *Bagley*, 220 F.3d at 519-22 (holding no actionable interference where plaintiff left store after customer was "offended" by sales clerk who refused to serve him, made obscene gesture, and previously stated that "I hate fucking Mexicans"); *Morris v. Office Max, Inc.*, 89 F.3d at 415 (holding no actionable interference under § 1982, although store's conduct was "undoubtedly disconcerting and humiliating" and may have "discouraged" plaintiffs from patronizing the store); *see also Hampton*, 247 F.3d at 1108 (stating that "discriminatory surveillance" is not actionable under § 1981) (citing *Lewis*, 948 F. Supp. at 371); *cf. Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 652-53 (8th Cir. 2003) (holding that "offensive" racial comments in the workplace fell short of the "severe and pervasive" harassment required to establish a legally cognizable claim of racial harassment under § 1981).

The *Green* decision goes as far as any in declaring that offensive conduct of a retailer amounts to interference, and we decline here to extend it. To recognize a § 1981 claim on the facts in this case, we believe, would dilute the requirement that a defendant "block" or "thwart" the creation of a contractual relationship. *Domino's Pizza*, 546 U.S. at 476; *Green*, 483 F.3d at 539.

---

not perceive a material difference between the "surveillance" alleged by the motion-to-dismiss plaintiffs, which Judge Benton agrees is not actionable, and the "active surveillance" of Gregory and the Turners that Judge Benton deems actionable.

By affirming Judge Wright's dismissal of these claims, however, we do not express the view (as suggested by plaintiffs' counsel at oral argument) that a certain level of race discrimination in retail establishments is "acceptable." Private parties engage in a variety of behavior that individual federal judges may deem unacceptable, but not all of it is unlawful. Whether and how federal law should regulate particular activity that is considered morally or socially unacceptable is a policy judgment made by Congress and the President. That judgment presumably involves inquiry into such matters as the scope and severity of the problem, the potential that private industry or decentralized regulators will address the problem, *see post*, at 21-22 (opinion of Benton, J.) (concluding that the plaintiffs have a cause of action under Missouri law); *post*, at 25 n.14 (opinion of Murphy, J.) (same), the likely effectiveness of federal legislation in solving the problem, and the collateral costs to the national economy of additional federal regulation. In a significant economic sector such as retail shopping, the potential benefits of sanctioning and deterring offensive and undesirable conduct through federal legislation likely must be weighed against the costs of litigation (including non-meritorious claims) that may be generated by expanded regulation,[11] the potential costs of different retail security measures that may be necessitated by such legislation, and the potential increase in shoplifting (presently estimated to be a $13 billion annual drain on retailers)[12] if merchants are

---

[11]*See*, *e.g.*, *Hearings on H.R. 4000, The Civil Rights Act of 1990 – Volume 3: Hearings Before the H. Comm. on Education and Labor*, 101st Cong. 2-8, 229-239 (1990) (statements of Edward E. Potter, President, National Foundation for the Study of Equal Employment Policies, and Theodore Eisenberg, Professor, Cornell Law School) (discussing the costs and benefits of expanding federal anti-discrimination legislation), *reprinted in* 6 *The Civil Rights Act of 1991: A Legislative History of Public Law 102-166* (Bernard D. Reams, Jr. & Faye Couture eds., 1994).

[12]*See* National Association for Shoplifting Prevention, Shoplifting Statistics, http://www.shopliftingprevention.org/WhatNASPOffers/NRC/PublicEducStats.htm (last visited May 6, 2009); *see also* National Retail Mutual Association, The 2007 National Retail Security Survey – Highlights, http://www.theftdatabase.com/news-stories/2007-nrss-highlights.html (last visited May 6, 2009) (citing statistics

discouraged from conducting legitimate security activity for fear of triggering additional lawsuits. We make no judgment about the wisdom of any policy option, but we conclude that § 1981 as presently drawn does not regulate the retail shopping environment to the extent urged by the plaintiffs in this case. Accordingly, we affirm the judgment of the district court with respect to § 1981.[13]

## C.

The district court also dismissed with prejudice the appellants' claims under the MHRA. These claims were before the district court based on supplemental jurisdiction under 28 U.S.C. § 1367(a). Whether the MHRA, through its definition of "place of public accommodation," extends to retail establishments is a novel question of state law. Because we conclude that the district court properly dismissed the federal claims, we remand the case with directions to modify the final judgment so as to dismiss the claims under the MHRA *without* prejudice, so they may be decided by the courts of Missouri. *See Birchem v. Knights of Columbus*, 116 F.3d 310, 314-15 (8th Cir. 1997); *Ivy v. Kimbrough*, 115 F.3d 550, 552-53 (8th Cir. 1997)

_____

from the 2007 National Retail Security Survey conducted by Dr. Richard Hollinger of the Criminology, Law and Society Program at the University of Florida).

[13]Judge Murphy's dissent responds to these observations by ascribing to us the belief that "a certain level of racial harassment is legally tolerable to facilitate modern retailing." *Post*, at 23. Our opinion, of course, says no such thing. We do not know whether the political branches even thought about retail establishments when they amended the statute in 1991 – given that a principal purpose of the legislation was to address a Supreme Court decision concerning employment discrimination, *see* H.R. Rep. No. 102-40, pt. 1, at 89-93 (1991) – much less whether Congress acted with the motivation posited by the dissent. In reaching our decision based on the text of § 1981 and the Supreme Court's guidance regarding the scope of the statute, we simply correct counsel's misconception that a court deems "acceptable" any undesirable conduct that is not unlawful, and observe that any additional regulation of the retail shopping environment raises potentially complex policy questions.

("In most cases, when federal and state claims are joined and the federal claims are dismissed on a motion for summary judgment, the pendent state claims are dismissed without prejudice to avoid needless decisions of state law . . . as a matter of comity and to promote justice between the parties.") (internal quotation and citation omitted).

BENTON, Circuit Judge, concurring in part and dissenting in part.

I agree that the nine motion-to-dismiss appellants fail to state a claim under 42 U.S.C. § 1981, for the reasons stated in Part III.A. of the Court's opinion. Also, in my view, the district court properly entered summary judgment as to Jeff McKinney, for the reasons stated in the second paragraph of Part III.B. of the Court's opinion.

As for the three remaining summary-judgment plaintiffs, I join the dissenting opinion, which follows more closely *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476-77, 479-80 (2006); *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 302 (1994); and, *Runyon v. McCrary*, 427 U.S. 160, 168-172 (1976). This Court correctly states the law in *Green v. Dillard's, Inc.*, 483 F.3d 533, 537-40 (8th Cir. 2007), *cert. denied*, 128 S.Ct. 1120 (2008). This Court in *Green* cites favorably *Garrett v. Tandy Corp.*, 295 F.3d 94, 101 (1st Cir. 2002), which, in my view, summarizes the controlling principles here:

> In a society in which shoplifting and vandalism are rife, merchants have a legitimate interest in observing customers' movements. So long as watchfulness neither crosses the line into harassment nor impairs a shopper's ability to make and complete purchases, it is not actionable under section 1981. . . . In other words, the challenged surveillance must have some negative effect on the shopper's ability to contract with the store in order to engage the gears of section 1981.

I believe that, taking all the facts detailed in the other two opinions in the light most favorably to Gregory and the Turners, a reasonable jury could conclude that Dillard's

active surveillance crossed the line into harassment and impaired their ability to make purchases.

As for the claims of Gregory and the Turners under the public accommodations provisions of the Missouri Human Rights Act, I would reverse the grant of summary judgment. *See Gregory v. Dillard's, Inc.*, 494 F.3d 694, 710-12 (8th Cir. 2007) (vacated and rehearing en banc granted); *Kenney v. Hereford Concrete Prods., Inc.*, 911 S.W.2d 622, 624-25 (Mo. banc 1995); *cf.* Mo. Rev. Stat. § 209.150.2 (visually, aurally, or physically disabled have right to full and equal treatment in "places of public accommodation," which are examples of "places to which the general public is invited.")

Therefore, I concur in part and dissent in part.

MURPHY, Circuit Judge, with whom BYE, MELLOY, and SMITH, Circuit Judges, join, dissenting.

I respectfully dissent from the majority's failure to give effect to the legislation enacted by Congress to give African Americans equal rights to contract and to purchase goods as possessed by whites. The record reveals that Crystal Gregory, Alberta Turner, Carla Turner, and Jefferson McKinney produced detailed evidence to show that the Dillard's store in Columbia, Missouri engaged in discriminatory treatment of black customers which interfered with their attempts to contract for merchandise. Since they established prima facie cases under § 1981 by raising issues of material fact, their claims should not have been dismissed on summary judgment.

These plaintiffs have produced a voluminous factual record revealing numerous instances of humiliating and disparate treatment experienced by African American customers during their visits to Dillard's. The factual development in this case may be unique not just for the number of discriminatory incidents detailed, but

also for the testimony by former Dillard's employees who described from the inside a store practice of targeting minority shoppers for enhanced suspicion, scrutiny, and harassment.

It is noteworthy that the majority largely neglects to discuss the facts of this case until the last quarter of its opinion and then seems to sweep them aside, concluding that a certain level of racial harassment is legally tolerable to facilitate modern retailing. Any suggestion that as a matter of federal law retailers may actively and intentionally obstruct the efforts of minority customers to purchase goods and services so long as they do not make it impossible would surely come as a surprise to those who enacted § 1981 and later reinforced it by the Civil Rights Act of 1991.

I.

Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). The statute is not primarily a piece of commercial legislation regulating merchants' rights or facilitating impersonal economic transactions. Section 1981 is first and foremost a civil rights statute. It was originally drafted in the immediate aftermath of the Civil War and was intended to protect the rights of the recently emancipated black citizens. The law's purpose is not simply to grant African Americans access to the marketplace; its purpose is to grant to them the <u>same</u> access "as is enjoyed by white citizens." <u>Id.</u>

Section 1981 traces its lineage to the Civil Rights Act of 1866, 14 Stat. 27 (1866). When Senator Lyman Trumbull of Illinois introduced the Act, Reconstruction efforts had in many instances already produced measures granting blacks the formal legal rights to buy, sell, own, and bequeath property. <u>See</u> Barry Sullivan, "Historical Reconstruction, Reconstruction History, and the Proper Scope

-23-

of Section 1981," 98 Yale L.J. 541, 551-52 (1989). But as Senator Trumbull recognized, technical legal entitlements would be of little value where prevailing customs and prejudices burdened their free exercise. The purpose of the Act, Trumbull declared, was to "secure to all persons within the United States practical freedom." Cong. Globe, 39th Cong., 1st Sess. 474 (1866) (emphasis added).

The Supreme Court took note of this Congressional purpose when it held in Jones v. Alfred H. Mayer Co., 392 U.S. 421 (1968), that the Act was intended to reach beyond state action to prohibit instances of private discrimination. Quoting Senator Trumbull, the Court recognized that with respect to the rights identified in the Act—including the right to make and enforce contracts— "the bill would 'break down all discrimination between black men and white men." Jones, 392 U.S. at 432 (quoting Cong. Globe, 39th Cong., 1st Sess., 599 (1866)) (emphasis added in Jones). The Court also noted that the debate in the House of Representatives reflected a similar understanding of the Act's reach: "It too believed that it was approving a comprehensive statute forbidding all racial discrimination affecting the basic civil rights enumerated in the Act." Jones, 392 U.S. at 435 (emphasis original).

Not only had Congress declared that racial discrimination was absolutely intolerable in the arena of contract formation, but it also later forcefully reversed an attempt by the Supreme Court to constrict the boundaries of that arena. The Court had attempted to limit the reach of § 1981 in Patterson v. McLean Credit Union, 491 U.S. 164 (1989), through a narrow interpretation of the right "to make and enforce contracts." The Court reasoned that the protected right "cannot be construed as a general proscription of racial discrimination in all aspects of contract relations" and held that conduct leading up to or following the actual moment of contract formation was beyond the scope of § 1981. Id. at 176. Congress specifically overruled Patterson in the Civil Rights Act of 1991, Pub. L. 102-166, 105 Stat. 1071. The 1991 Act also added a new subsection to § 1981 which expansively defined protected contract rights to include "the making, performance, modification, and termination

of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

The House Judiciary Committee, in recommending the 1991 Act for approval, noted its intention to "restor[e] the broad scope of Section 1981," H.R. Rep. No. 102-40, pt. 2, at 2 (1991), and "to bar all racial discrimination in contracts," id. at 37 (emphasis added). The House Education and Labor Committee took specific aim at the Supreme Court's attempted limitation of § 1981 when it identified a "compelling need . . . to overrule the Patterson decision and ensure that federal law prohibits all race discrimination in all phases of the contractual relationship." H.R. Rep. No. 102-40, pt. 1, at 92 (1991) (emphasis added).

To hold that a retail store may engage in intentional practices designed to hinder or burden an African American's attempts to make and enforce contracts fundamentally misapprehends Congress's intentions in enacting § 1981. It is not enough that merchants grudgingly afford African Americans some access to their goods and services. By § 1981's plain terms and its unambiguous history, merchants must offer the same access as is enjoyed by all other customers, regardless of race.

II.

After initially disposing of the claims of nine of the appellants for failure to state a claim, the district court granted summary judgment to Dillard's against Crystal Gregory, Alberta and Carla Turner, and Jefferson McKinney. I turn first to the § 1981 claims of these four plaintiffs.[14]

---

[14]Gregory and the Turners also brought state law claims under the Missouri Human Rights Act (MHRA), Mo. Rev. Stat. § 231.065 (2002). The majority, having upheld the dismissal of all federal claims, remands the state claims for dismissal without prejudice. But because the district court erred in ruling against Gregory and the Turners on their federal claims, its holding on the MHRA should be revisited for

-25-

This court has agreed on the four elements of a § 1981 claim: (1) membership in a protected class, (2) discriminatory intent on the part of the defendant, (3) engagement in a protected activity, and (4) interference with that activity by the defendant. See Bediako v. Stein Mart, Inc., 354 F.3d 835, 839 (8th Cir. 2004). In this case all appellants satisfy the first element. As to the second element, the majority correctly notes that Dillard's does not urge dismissal on the ground that the plaintiffs have failed to present a disputed issue of fact regarding discriminatory intent. Rather, both Dillard's and the majority focus on the third and fourth elements, challenging the legal sufficiency of the plaintiffs' evidence and allegations regarding whether Dillard's actionably interfered with activities protected by § 1981. I will examine these elements in turn, but it is first important to relate the evidence produced by the summary judgment plaintiffs.

## A.

On Dillard's motion for summary judgment, the four plaintiffs—as nonmoving parties—were entitled to have all facts considered in the light most favorable to them and to have all reasonable inferences drawn in their favor. The same principle applies during our de novo review of the district court's grant of summary judgment. McLean v. Gordon, 548 F.3d 613, 616 (8th Cir. 2008).

Crystal Gregory was a 31 year old full time student and the wife of a police officer when she visited the Columbia Dillard's in February 2001 with the specific intent to purchase a "dressy outfit." As she examined the merchandise and made her selections, a sales associate named Tracy asked if she could help. Despite Gregory's assurances that she did not require assistance, Tracy followed her closely as she shopped in the Ralph Lauren section. There, Gregory chose a pair of pants she liked

---

reasons discussed in the earlier panel opinion. See Gregory v. Dillard's, Inc., 494 F.3d 694, 710-12 (8th Cir. 2007), vacated and reh'g en banc granted.

and carried them to a fitting room to try on. When she emerged with the pants, she found Tracy guarding the fitting room door with her arms crossed and a smirk across her face. Two police officers were also waiting just outside the entrance to the fitting rooms. Gregory described the atmosphere as "very hostile." Offended and humiliated by Tracy's conduct and her evident suspicions, Gregory asked to speak to a manager. The manager on duty seemed not to take Gregory's complaint seriously, and Gregory left the store in disgust without completing her intended purchase.

Gregory further testified that she could not recall a time when she had visited the Columbia Dillard's and was not closely trailed by store employees. She also stated that on one shopping visit she had overheard a sales associate characterize African Americans as thieves.

Alberta Turner was a 52 year old daycare provider when she and her adult daughter Carla, an insurance agency employee, patronized Dillard's Columbia store on Memorial Day 2002. Alberta and Carla were regular customers who, despite having previously purchased hundreds of dollars worth of merchandise from the store, had both been routinely subjected to overbearing behavior on the part of store personnel. On Memorial Day the two women were accompanied by Alberta's two granddaughters, one of whom was Carla's daughter.[15] Alberta and Carla purchased several pairs of shoes for the children before splitting up to continue shopping. Carla selected several outfits for her daughter who tried them on in a fitting room. As mother and daughter exited the fitting room, they were confronted by a sales associate and a security guard. The sales associate stared at Carla's Dillard's bag, which held the previously purchased shoes, but did not ask to examine its contents. Nevertheless, the guard began trailing Carla closely as she walked back to the

---

[15]Felicia Turner—daughter to Alberta and sister to Carla—chose to wait in the parking lot on Memorial Day rather than expose herself to the type of harassment she and other members of the family had previously experienced at Dillard's. Felicia was one of the plaintiffs dismissed under Rule 12(b)(6).

department where her mother was doing her shopping. When Carla asked the guard why he was following, he made no answer. Alberta became upset to see her daughter treated in this manner and decided against making her intended purchase. Alberta started to challenge the security guard about his behavior but quickly changed her mind when she realized how upset her granddaughters had become by what was occurring. Before leaving the store, Alberta told a sales associate that the store had just lost a large sale. The employee asked with a "weird grin," "So? So what?"

After Alberta reached her car in the parking lot, frustrated with the family's experience inside Dillard's and surrounded by crying children, she decided she should go back inside the store to protest to a manager. She located a manager and asked him to inform his employees that "everybody who comes in here is not out to . . . take things from them." When the manager inquired about her experience, Alberta found herself too upset to repeat it.

Jefferson McKinney was in his early fifties and was a United Parcel Service employee when he visited the cologne counter at the Columbia Dillard's. He testified that he made eye contact with a sales associate in an attempt to gain her attention, but the associate ignored him in favor of later arriving white customers. While waiting to be served, McKinney and his two cousins tested various cologne samples displayed on the counter. After having ignored McKinney and his cousins for fifteen minutes, the sales associate finally approached their counter. But instead of speaking to them or offering assistance, she simply swept the counter samples away. One of McKinney's cousins asked the associate why they were being ignored and asked to speak to a store manager. Upset at the associate's "rude . . . tone" in response, McKinney left the store without completing a purchase.

B.

As there is no dispute that the plaintiffs in this case are African American and therefore members of a protected class, I begin my analysis with the second element of a § 1981 claim. That element requires that plaintiffs prove discriminatory intent on the part of defendants. Dillard's generally denies that its managers and employees acted with racial animus, but as the majority correctly notes, the company has not urged this ground for dismissing the plaintiffs' claims on summary judgment. The majority likewise declines to discuss this element, reserving its analysis for the third and fourth components of a § 1981 claim. Nevertheless, for the sake of completeness, I will review the evidence supporting the plaintiffs' allegations that Dillard's and its personnel acted with racial animus in targeting African American customers for harassing treatment.

Direct or circumstantial evidence may be offered for a prima facie showing of discriminatory intent. Kim v. Nash Finch Co., 123 F.3d 1046, 1059 (8th Cir. 1997). Since direct evidence is rarely available, see id., a systematic practice of affording black customers different treatment provides circumstantial evidence of discriminatory intent. See White v. Honeywell, 141 F.3d 1270, 1276 (8th Cir. 1998).

In this case we have not only the testimony of the four summary judgment plaintiffs that they were greeted with hostility and suspicion, but we also have testimony from former employees of Dillard's relevant to establish a custom and practice there of singling out African American shoppers for inferior treatment and intimidation.

Former men's fragrance saleswoman Tammy Benskin testified that the security code "44" was customarily announced over the store's intercom system whenever an African American entered the store. Benskin also stated that the code was announced "ninety percent more" for black shoppers than for white shoppers. She further

-29-

reported that the store manager and his assistants routinely subjected black customers to intense scrutiny and surveillance while allowing white patrons to browse the store undisturbed.

Former men's department salesman Rick Beasley testified that black customers faced higher burdens than white customers when attempting to return purchases without a receipt.

Former employee Theresa Cain testified that security personnel were so disproportionately aggressive in monitoring black customers that they often missed similar offenses committed by white shoppers.

Police sergeant Kenneth Gregory (husband of appellant Crystal Gregory) worked as a security guard at the Columbia Dillard's during the 1990s. He testified that black customers were subjected to more searching scrutiny and surveillance and that suspected white shoplifters were allowed to surrender their stolen merchandise and leave the store while suspected black shoplifters were detained and arrested.

Maren Snell had worked in the women's fragrance department of Dillard's Columbia store. She testified that she observed store employees refuse a black customer's attempts to return merchandise despite providing proof of purchase labels while accepting the returns of white customers who lacked receipts. She stated that she was instructed by supervisors to "watch those black kids" and not to give fragrance samples to black girls since "they're not going to buy anything anyway."

In addition to the testimony of these former employees, the depositions of those appellants dismissed for failure to state a claim strongly corroborate the routinely hostile and racially intimidating atmosphere within the Columbia Dillard's. Although these plaintiffs were dismissed on the basis of their pleadings, their deposition

testimony developed during discovery is relevant to show a pattern or practice of intentional discrimination. See Fed. R. Evid. 404(b).

Snell was not only a former Dillard's employee. She was also an occasional customer and was one of the black complainants dismissed by the district court for failure to state a claim. She testified that she herself had been targeted for discriminatory surveillance and trailed throughout the store during off duty shopping trips.

Appellant Arnel Monroe is a special education teacher and a high school football coach. He noted that Dillard's was at one time the only local place to shop for professional apparel. He testified to being followed by a Dillard's security guard as he carried a Kenneth Cole shirt in which he was interested to look at jeans. Monroe was shopping with his daughter, who was upset by the guard's behavior. Monroe felt so humiliated by it that he abandoned his intended purchase of the shirt.

Plaintiffs LaShanda Wisham, Capria Lee, Felicia Turner, and Treva Gage gave similar accounts of harassing surveillance and close, intimidating scrutiny at the Columbia Dillard's. Turner and Gage testified that the behavior of its employees had reached such an intolerable level that they eventually decided not to even go there anymore.

Appellant Michael Warrick is general counsel to Missouri's Department of Natural Resources. He testified that he, too, was trailed by store personnel during a trip to the Columbia Dillard's and that a sales associate went so far as deliberately to bump into him in an effort to dislodge any concealed merchandise. Warrick says he was so infuriated by this extraordinary tactic that he could not return to Dillard's for four years.

Appellant Debra Hamilton testified that not only had she regularly been followed while shopping at the Columbia Dillard's, but also that she had been passed over at a check out counter in favor of later arriving white customers.

Appellant Michael Richmond testified that when he requested to see a particular piece of jewelry locked in a Dillard's display case, the sales associate suggested he instead look at lower priced merchandise. Richmond said he left the store in frustration after responding with a swear word to what he considered insulting race based treatment. He complained about the incident to an assistant manager who apologized and suggested he contact the store manager. Richmond also testified that he was routinely followed when he shopped at Dillard's and that on at least one occasion a sales associate purposely avoided him rather than help him complete a purchase.

Plaintiff Michael Butler ultimately reached a settlement with Dillard's on his claim of discriminatory treatment, but his deposition testimony illustrates the extra burdens the Columbia Dillard's placed on African American customers. Butler testified that he attempted to exchange a pair of defective shoes which he had purchased the night before, but he accidentally left his receipt at home. Dillard's employees attempted to confiscate the shoes, stating that he might have stolen them. Butler was upset and requested that a manager contact him. In the following days, Butler repeatedly called Dillard's seeking a manager to whom he could complain about having been treated as a thief. After more than a week passed, a manager finally returned Butler's calls and asked that he bring the shoes in with a receipt. Butler did so, but another week passed before a replacement pair arrived. He received no apology for having been treated as a thief or for the store's delay in responding.

The facts developed at the summary judgment stage thus made out a prima facie case that Dillard's customarily and intentionally singled out African American shoppers for race based harassment and discriminatory provision of services.

C.

It is agreed that § 1981 does not provide a general cause of action for private racial discrimination, see Youngblood v. Hy-Vee Food Stores, Inc., 266 F.3d 851, 855 (8th Cir. 2001), and that the third element—engagement in a protected activity—requires that plaintiffs have an interest covered by the statute, in this case the right to make and enforce contracts on the same terms and under the same conditions as white customers. To satisfy this element "[i]n the retail context, § 1981 plaintiffs are required to demonstrate that they actively sought to enter into a contract with the retailer. There must have been some tangible attempt to contract." Green v. Dillard's, Inc., 483 F.3d 533, 538 (8th Cir. 2007), cert. denied, 128 S. Ct. 1120 (2008) (internal citations and quotation marks omitted).

It is difficult to generalize about when a shopper's interactions with a merchant ripen into a protected "tangible attempt to contract" because by definition the determination must be fact based. What is clear, however, is that § 1981 prohibits discrimination in "all phases and incidents" of a contractual relationship, Rivers v. Roadway Express, Inc., 511 U.S. 298, 302 (1994), thus clearly reaching conduct preceding the actual consummation of a contract. The statute "protects the would-be contractor along with those who already have contracts." Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476 (2006). The process of contract formation is admittedly fluid: "[e]ach time a customer takes an item off the shelf, a new contract looms, and each time the item is returned, the potential contract is extinguished." Garrett v. Tandy Corp., 295 F.3d 94, 100 (1st Cir. 2002). But it is precisely this process which is protected by the right to make and enforce contracts. The statute's reach "extends . . . beyond the four corners of a particular contract; the extension

applies to those situations in which a merchant, acting out of racial animus, impedes a customer's ability to enter into . . . a contractual relationship." Id.

The steps toward contract formation will vary by context. The purchase of a standardized commercial product—a can of soda or a packet of chewing gum—from a low service convenience store requires virtually no interaction between customer and clerk aside from the tender of payment. Mere seconds may elapse between the formation of a customer's intent to purchase and the final exchange of cash for goods. The protected activity may therefore be quite brief. On the other hand, a consumer's purchase of expensive durable goods—a new washer and dryer or a new car—often involves significant customer education, inspection of wares, comparison of prices and features, negotiation of financing agreements, and extended assistance by informed sales agents. In such circumstances the process of contract formation may be quite lengthy, and the customer's specific intentions may wax and wane throughout. The set of protected activities may therefore comprise a wide range of precontractual interactions and services.

In the specific context of department store shopping, it is incontrovertible that customers will often want to inspect garments for quality and fit or sample fragrances for scent before concluding a purchase. Modern retailers such as Dillard's place much of their merchandise on open display, inviting browsers to examine, sample, and inspect their goods, all with an eye towards generating sales. The atmosphere and ambience of a high end retail store are part of its overall allure and contribute both to the shopping experience and the customer's willingness to consider goods for purchase. When a shopper in good faith takes advantage of these opportunities, she is surely protected by § 1981. It would be remarkable indeed to conclude otherwise and to permit a merchant out of pure racial animus to deny African American customers access to fitting rooms so long as it allowed such customers to purchase outfits straight from the rack. These considerations are particularly important in light of the original 1866 Act's focus on "practical freedom," Cong. Globe, 39th Cong., 1st

Sess. 474 (1866) (Sen. Trumbull), and the purpose of the 1991 amendments to "ensure that federal law prohibits all race discrimination in all phases of the contractual relationship," H.R. Rep. No. 102-40, pt. 1, p. 92.

Even a commercial establishment's seemingly gratuitous services can create contractual obligations. In Barfield v. Commerce Bank, N.A., 484 F.3d 1276 (10th Cir. 2007) (McConnell, J.), an African American without an account at the defendant bank had requested that it make change for a $50 bill. He was refused service even though a similarly situated white man making the same request was subsequently given change without question. The Tenth Circuit held that the plaintiff made out a § 1981 claim. The court held that the request for change had been an offer to contract despite the apparent lack of financial gain to the bank for providing such a service. "[A] customer's offer to do business in a retail setting qualifies as a 'phase[] and incident[] of the contractual relationship' under § 1981." Id. at 1278. Barfield reaffirmed the principle that a merchant's offer of unbargained for gratuities can create contractual relationships, for "a retail establishment's offer of a free service or sample in fact could constitute a contract within the meaning of Section 1981. The establishment receives a benefit from such offers because 'to sample those products, the customer would traverse the store, perhaps eyeing other merchandise for purchase.'" Id. at 1280 (quoting Hampton v. Dillard Dep't Stores, Inc., 247 F.3d 1091, 1105 (10th Cir. 2001)).

Even if preliminary interactions do not themselves create binding contractual duties, this court has recognized that the process of contract formation is protected under § 1981. The standard our court has adopted in order to state a § 1981 claim during this precontractual phase is that a plaintiff must have "actively sought" or made "some tangible attempt" to enter a contract. Green, 483 F.3d at 538. But this has to be understood in light of the realities of modern merchandising. A shopper may, for example, display an intent to contract by taking an item to a fitting room to make sure it looks right; if the fit is not right the process ends there. By reconsidering

a potential purchase, a shopper may also abandon a good faith intention to purchase without losing the protection of the statute. If an irreversible commitment to purchase were always necessary before a plaintiff may state a § 1981 claim, then retailers could openly and actively discourage minority shoppers from ever reaching that point and thereby render § 1981 a dead letter.

This dynamic is well recognized in other § 1981 contexts, including that of discriminatory treatment by restaurants. In Eddy v. Waffle House, Inc., 482 F.3d 674 (4th Cir. 2007), vacated on other grounds and remanded, 128 S. Ct. 2957 (2008), the Fourth Circuit upheld the § 1981 claim of a black family that had sought service at a Waffle House restaurant in South Carolina. The family had been greeted by a waitress who allegedly remarked, "We don't serve niggers here." Although the family left without ever ordering food or consummating a contract, the court held that "dining at a restaurant generally involves a contractual relationship that continues over the course of the meal and entitles the customer to benefits in addition to the meal purchased." Id. at 678 (quoting Arguello v. Conoco, Inc., 330 F.3d 355, 360 (5th Cir. 2003)). There is no principled reason to distinguish between a restaurant's valuable precontractual services and those offered by a high end department store. In either setting "a reasonable person would not expect to be served in an openly hostile environment." Eddy, 482 F.3d at 678.

Taken as a whole, the cases in this circuit and elsewhere suggest that whether a customer has demonstrated a sufficiently tangible interest in a merchant's goods requires careful attention to the plaintiff's intentions. In this circuit we have held that the necessary intent was revealed and "the contracting process began as [the customer] looked at the watches in the display case and selected which one she was interested in." Green, 483 F.3d at 538. "It is intent to purchase . . . that is needed to create a contractual interest." Id. at 539. The Sixth Circuit similarly adopted an intent to purchase standard when it held that a customer who had selected items for purchase and placed them in her shopping cart and who had the necessary means and

intention of completing a sale was protected by § 1981. Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 874 (6th Cir. 2001). Christian is in accord with an earlier Sixth Circuit case in which two African Americans were asked to leave a whites only club before they had a chance to order drinks. Watson v. Fraternal Order of Eagles, 915 F.2d 235 (6th Cir. 1990). The court held that the plaintiffs' failure to request service was not fatal to their § 1981 claim:

> If they were asked to leave in order to prevent them from purchasing soft drinks, [this] could be found to be merely the method used to refuse to contract. Were it otherwise, commercial establishments could avoid liability merely by refusing minorities entrance to the establishment before they had a chance to order.

Id. at 243.

Notably, the Green, Christian, and Watson opinions recognized that a protected contractual relationship arises during the contract formation process and well before the fleeting moment when payment is tendered for the purchased goods. None of the cases purports to set a lower bound below which such interests as a matter of law are insufficient to state a claim under § 1981.[16] In fact there is no well marked lower boundary aside from the common sense proposition that mere passersby and loiterers have no rights protected by § 1981. The majority cites the Tenth Circuit's decision in Hampton for its conclusion that § 1981 does not protect individuals "from harassment upon entering a retail establishment" and that a successful § 1981 claim must allege "interference with a contract beyond the mere expectation of being treated

---

[16]In opposition the majority cites McQuiston v. K-Mart Corp., 796 F.2d 1346 (11th Cir. 1986), a state law product liability case in which the dispositive issue was whether the retailer would be liable for a shopper's injuries under an implied warranty. In contrast, § 1981 cases are correctly concerned with the steps in contract formation and whether the retailer interfered with or thwarted the shopper's intent to contract.

without discrimination while shopping." Id. at 1118. But the section of Hampton cited approvingly by the majority concerned a plaintiff whose claim was dismissed precisely because she never had any intention of buying merchandise and whose "shopping" consisted merely in accompanying her aunt to the defendant's store. Id. The aunt, by contrast, completed a purchase but was later harassed by a store security guard as she attempted to exercise her contractually acquired right to redeem a coupon for a free fragrance sample. The court upheld the aunt's § 1981 claim along with the jury's award of $56,000 in compensatory damages and $1.1 million in punitive damages. Id. at 1115 & 1117.

The Fifth Circuit's holding in Morris v. Dillard Department Stores, Inc., 277 F.3d 743 (5th Cir. 2001), is similarly unremarkable. In that case the court held that "a plaintiff must establish the loss of an actual, not speculative or prospective, contract interest." Id. at 751. But as with Hampton, the facts of the case put the holding in the proper context. Morris had asserted a § 1981 claim based on the defendant's banishing her from returning to its store following her arrest for suspected shoplifting. The court held that the mere possibility that Morris, at some future point during her term of banishment, might have sought to shop at Dillard's was too speculative to support a claim under § 1981. Id. A shopper who asserts that she may one day seek to shop at a defendant's store is easily distinguished from a shopper who establishes her actual good faith intentions by entering a store and examining its merchandise for the purpose of purchasing items which meet her tastes, needs, and budget. The former, as the Fifth Circuit notes, asserts "speculative or prospective" interests. The latter demonstrates a tangible interest in consummating a purchase.

The Seventh Circuit appeared to set a restrictive standard for § 1981 cases in Morris v. Office Max, Inc., 89 F.3d 411 (7th Cir. 1996), holding that plaintiffs require more than a general interest in merchandise to state a successful claim. But the Seventh Circuit in Bagley v. Ameritech Corp., 220 F.3d 518 (7th Cir. 2000),

subsequently confirmed that <u>Office Max</u> does not require that plaintiffs go so far as to tender payment for desired merchandise in order to satisfy the tangible attempt test. In <u>Bagley</u>, the court held that if a plaintiff enters a store for the purpose of purchasing merchandise, he is protected under § 1981 even if he does not specifically communicate that intention to store employees. <u>Id.</u> at 521. To hold otherwise, the court reasoned, would lead to a "reprehensible" result in which a store could avoid liability under § 1981 simply by preemptively refusing service to African American customers before they had a chance to signal their intent to make a purchase. <u>Id.</u>

There appears to be common agreement that an active request to purchase goods triggers § 1981's protections, while idle loitering with no intent to purchase does not. But between these two extremes lies a vast middle ground of behaviors and intentions, and determining when an individual has demonstrated the necessary good faith interest in purchasing goods requires "careful line-drawing, case by case." <u>Garrett</u>, 295 F.3d at 101. In the present case the four plaintiffs dismissed at summary judgment have at the very least created genuine factual disputes as to their intentions in visiting Dillard's Columbia store.

As previously described, Crystal Gregory visited Dillard's in February 2001 for the specific purpose of purchasing a "dressy outfit." She selected a pair of pants and entered a fitting room to try them on. She ultimately chose not to purchase the pants after being humiliated by store security personnel. Nevertheless Gregory, who had shopped at Dillard's on several previous occasions, made a tangible attempt to purchase goods from Dillard's when she entered the store with the intention to buy a specific type of outfit and when she "looked at" and "selected" an item matching her interest. <u>Green</u>, 483 F.3d at 538; <u>see also</u> <u>Christian</u>, 252 F.3d at 874 (acknowledging a protected interest when customer who had necessary intention and means of payment selected an item for purchase).

-39-

Alberta and Carla Turner were also good faith customers of Dillard's who had previously spent hundreds of dollars at the Columbia store. During their Memorial Day visit, the two women purchased several pairs of shoes for Alberta's granddaughters. Afterwards Carla and her daughter selected several outfits for the girl to try on in a fitting room. Selecting items of interest and trying them on in a fitting room were more than sufficient to establish a tangible attempt to contract. Alberta had meanwhile continued to shop with her granddaughter and remarked to a sales associate after the humiliating treatment of Carla that Dillard's had lost a large sale. These facts indicate Alberta had intended to make additional purchases at the store that day.

Jefferson McKinney visited the cologne counter at the Columbia Dillard's with two of his cousins. Their arrival at a specialized service counter indicates their interest in a particular type of product, namely men's fragrances. McKinney made eye contact with a sales associate in an attempt to engage her attention, but was ignored in favor of white customers. While waiting, McKinney and his two cousins tested cologne samples displayed on the counter. The majority suggests that testing fragrance samples is activity beyond the scope of § 1981. But a customer's inspection of a merchant's openly displayed products as part of a good faith attempt to select an item for purchase is a critical step in the formation of a contract.

To focus too narrowly on the discrete moment when payment is actually exchanged for merchandise would be to resurrect the approach of Patterson, in which the Supreme Court excluded from § 1981 protection any conduct leading up to and following contract formation. Congress explicitly rejected this interpretation in the 1991 amendments to the statute and reaffirmed its intention that § 1981 sweep widely enough to cover all "phases and incidents" of the contractual relationship. Rivers v. Roadway Express, Inc., 511 U.S. 298, 302 (1994). McKinney's attempt to engage a sales associate for assistance and his inspection of several fragrance samples

-40-

indicated he was more than an idle passerby and were enough to present a factual dispute as to his intentions and purpose.

All four of the summary judgment plaintiffs have therefore presented enough evidence to establish a prima facie case regarding their engagement in activity protected under § 1981.[17]

D.

The fourth and final element of a § 1981 claim requires interference by the defendant with the plaintiff's protected interests. In our circuit interference which "as a whole thwart[s] [a customer's] attempt to make and close a contract" is actionable. Green, 483 F.3d at 539. Although the majority recognizes this holding, it would like to confine it to instances where a merchant actually makes the formation of a contract impossible. Under such reasoning, a customer who abandons an intended purchase for any reason has merely been deterred rather than thwarted and therefore cannot state a claim under § 1981. Not only will Green not support this approach, it flatly precludes it.

In Green a husband and wife had completed one purchase and were being assisted in another when a hostile sales associate—who had previously refused them service—referred to them as "fucking niggers." Although the salesperson helping them was prepared to complete the sale, the upset Greens asked for a manager,

_____

[17] The majority charges the dissent with "dissent[ing]," ante p. 15, from the panel majority opinion in respect to Jefferson McKinney. The process was rather one of reconsideration of his case after examining every line of deposition evidence in the record. McKinney's evidence as well as the extensive corroborating material in the record led to the conclusion that he should not have been dismissed on summary judgment. (Thorough reexamination of the record also led to a corrected summary of Michael Butler's experience at Dillard's.)

declined to complete the second transaction, and rescinded the first one. While the Greens had not in any physical sense been blocked from making or enforcing a contract, they had been insulted and deterred by the one associate's continuing "pronounced hostility" and her "forceful racial insult" which we concluded actionably interfered with their attempt to close a contract and violated the Greens' § 1981 rights. Green, 483 F.3d at 539. Green teaches that a retailer through its employees may create an atmosphere of such hostility and intimidation that it is sufficient to thwart the exercise of a customer's § 1981 rights, causing customers to abandon their intended purchases.

The majority claims it is simply declining "to extend" Green, ante at 18, when, in fact, its opinion would effectively replace the rule of our own circuit with a much stricter standard imported from the Fifth Circuit. It cites Arguello v. Conoco, Inc., 330 F.3d 355 (5th Cir. 2003), for the proposition that a customer's voluntary abandonment of a purchase cannot be causally linked to a merchant's harassing or hostile conduct. See also Bagley v. Ameritech Corp., 220 F.3d 518 (7th Cir. 2000) (taking an approach similar to Arguello's). Not only is Arguello not the law of this circuit, it is distinguishable from the case before the court since the customer who abandoned his transaction there had only witnessed abusive behavior directed at another and had not himself been the target.

Other courts look more carefully at the nature of the interference in judging what is actionable. In Hampton the Tenth Circuit held that a security guard's "interruption" of a customer's attempt to redeem a coupon was actionable interference even though the intended transaction had not been rendered impossible. Hampton, 247 F.3d at 1106. Refusal to accept a check from a black customer was held to be actionable interference under § 1981 by the Fourth Circuit in Williams v. Staples, Inc., 372 F.3d 662, 668 (4th Cir. 2004). Moreover, an insult directed at one member of a group can create an atmosphere hostile enough to chill the rights of other members since "[o]ne would certainly not expect anyone in the party to stay and feel

-42-

welcome when other members of the same party had been subject to racial epithets. By denying service to one member of the party, the defendant effectively denied service to the other members of the same party." Eddy, 482 F.3d at 678.

Section 1981 does not require as a matter of law that within the context of closing a contract a customer persist in her attempted purchase despite overt racial hostility right up until a merchant flatly denies her service and forcibly ejects her from the premises. To suggest otherwise would enable a retailer to create an environment so odious to minority customers that they will flee immediately upon entering a store and be unable to obtain merchandise held out to the public for sale. Based on the common meaning of interference, the history of § 1981, its purpose to eliminate all racial discrimination in contractual relationships, and the established precedents of this and other circuits, it is clear that a merchant's discriminatory conduct is actionable when it obstructs, hinders, or deters an African American customer from making her intended purchases. The question before the court, of course, is whether the facts of this case, viewed in a light most favorable to the summary judgment plaintiffs, establish such interference.

Gregory and the Turners all allege that they were subjected to discriminatory monitoring which interfered with their shopping at the Columbia Dillard's. Such treatment, when it is racially motivated, states a § 1981 claim as may be seen in Hall v. Pennsylvania State Police, 570 F.2d 86 (3d Cir. 1978). In that case, a bank photographed any suspicious black person who entered its premises but no others. Although the photography was undertaken at the request of the police, the Third Circuit held that a black customer subjected to it had made out a § 1981 claim. As the court explained, "[s]ection 1981 obligates commercial enterprises to extend the same treatment to contractual customers 'as is enjoyed by white citizens.'" Id. at 92 (emphasis added). Because the photography policy was directed only at black customers, the court concluded that the plaintiff had "received disparate, and because it was based on race, disparaging treatment for which the record offers no

-43-

justification" and which the court determined was sufficient to state a § 1981 claim. Id. The evidence of disparaging treatment produced by the summary judgment plaintiffs in this case also shows overt discrimination "for which the record offers no justification."[18]

The majority attempts to distinguish Hall by suggesting its holding is limited to cases in which a preexisting customer is subjected to differential race based treatment, but the court's decision does not indicate whether the plaintiff had been a customer or not. In fact the state police policy was directed against "suspicious" blacks who might enter the bank seeking directions, change, or "for no apparent reason." Id. at 88. The decision turned not on the third element of a § 1981 claim (protected interest), but on the fourth (actionable interference). The plaintiff's photograph had been taken as part of "a racially based surveillance scheme," id. at 92, and the bank violated § 1981 because it interfered with his protected interest by "offer[ing] its services under different terms dependent on race." Id.

After attempting to distinguish Hall, the majority argues that as a matter of law discriminatory surveillance cannot support a § 1981 claim, and it follows the district court's mistaken lead by citing for this proposition Garrett and Hampton. Reliance on these cases is curious for Garrett merely holds that "[u]nadorned" surveillance is legally insufficient: "[s]o long as watchfulness neither crosses the line into harassment nor impairs a shopper's ability to make and complete purchases, it is not actionable under section 1981." Garrett, 295 F.3d at 101. Obviously the court

_____

[18]The majority suggests that this dissent's discussion of Hall opens the door to § 1981 claims arising from "surveillance unknown to a shopper," ante at 11, but the Third Circuit's opinion does not indicate whether or not Hall or other customers were aware they were photographed while in the bank. What is clear is that the bank had a routine, race based policy of targeting black visitors for discriminatory treatment. In this sense the bank's behavior parallels Dillard's policy of announcing a code "44" when an African American entered the Columbia store.

believed that harassing watchfulness or surveillance which "impairs a shopper's ability to make and complete purchases" crosses the line and is actionable, for when surveillance has a "negative effect" on a "shopper's ability to contract with the store," it will "engage the gears of section 1981." Id.; cf. Hampton, 247 F.3d at 1108 ("[E]vidence of discriminatory surveillance . . . on its own [is] not actionable under § 1981.") (emphasis added).

Disregard for the underlying facts of a case can lead a reader astray. The plaintiff in Garrett was indeed watched as he shopped the aisles of the defendant's store, but "his amended complaint leaves no doubt but that, during his visit to the store, [its] employees were helpful and courteous; they facilitated his purchase of the items he selected, and even reached out to other branches in an effort to locate an out-of-stock product that he wished to buy." Garrett, 295 F.3d at 101. In short, the Garrett plaintiff had not "alleged that the surveillance entailed harassment or otherwise interfered with his ability to make desired purchases." Id. The plaintiffs in the current case present a markedly different set of facts and allegations. The evidence suggests that Dillard's personnel sometimes crossed the line into actionable harassment and withheld standard services, courtesies, and assistance from black customers which interfered with their attempts to contract.[19]

---

[19]In footnote 10, ante at 17 n.10, the majority again overlooks the critical limitation the Garrett court included in its analysis. The First Circuit indicated only that "[u]nadorned" surveillance could be permissible under § 1981, but it also made clear that watchfulness could "cross[] the line into harassment" and thereby become actionable interference. Garrett, 295 F.3d at 101. The majority's suggestion that it can find no "material difference" between the surveillance in Garrett and the alleged conduct of Dillard's in the current case, ante at 17 n.10, is puzzling. While the store employees in Garrett were "helpful and courteous," Garrett, 295 F.3d at 101, the plaintiffs in this case have testified that Dillard's personnel were "rude" and "hostile." A factfinder could reasonably determine from the evidence here that the attitude and demeanor of Dillard's personnel had a "negative effect" on the plaintiffs' "ability to contract with the store" and thereby "engage[d] the gears of section 1981." Id.

Gregory testified that she was routinely trailed by Dillard's employees whenever she shopped at the Columbia store and that she had overheard a sales associate refer to African Americans as thieves. During her February 2001 visit to Dillard's, Gregory was closely followed by a sales associate identified as Tracy. Although Gregory assured Tracy that she did not need assistance, Tracy shadowed her as she examined merchandise. After selecting a pair of pants and trying them on in a fitting room, Gregory emerged to find Tracy guarding the room with her arms crossed and smirk on her face. Two police officers waited nearby. Gregory testified that the atmosphere was "very hostile."

On Dillard's motion for summary judgment, we are obliged to consider these allegations in the light most favorable to Gregory. A reasonable jury could certainly conclude from Gregory's evidence that the behavior exhibited by Tracy was hostile and intimidating. Dillard's may argue that a more patient shopper would have endured this treatment and persisted in making a purchase in spite of it. The proper forum for questions of fact, however, is at trial and not here on review of a motion for summary judgment. Because Gregory has presented a genuine issue of material fact as to whether Dillard's surveillance crossed the line into harassment, summary judgment was inappropriate.

The Turners tell a similar story. Alberta and Carla were regular customers at the Columbia Dillard's and were familiar with the store's practice of harassing and intimidating African American shoppers. During their Memorial Day visit, Carla was confronted by a sales associate and a security guard as she exited a fitting room in which her daughter had tried on an outfit. Without any comment or inquiry the sales associate stared at Carla's shopping bag in which she carried shoes she had purchased at Dillard's earlier in the day. The guard closely followed Carla as she walked to rejoin Alberta in another department. Carla asked the guard why he was following her, but he ignored her. Alberta was angered to see her daughter treated with such suspicion and hostility. Alberta began to confront the security guard about his

behavior, but changed her mind upon seeing how upset her granddaughters had become during the episode. The whole experience was so unsettling to the family that Alberta returned to the store from the parking lot to let a manager know how upset she was by the interference with their shopping.

For purposes of summary judgment, our obligation is to examine these facts developed in discovery in the light most favorable to the Turners. Since Alberta and Carla Turner have presented genuine issues of material fact as to whether the conduct of Dillard's employees was harassing and intimidating enough to thwart their attempts to purchase goods and to state claims under § 1981, summary judgment was inappropriate.

Finally, McKinney alleges that he tried to purchase cologne at Dillard's Columbia store but that he received no assistance. McKinney testified that he attempted to catch the attention of a sales associate but that she instead repeatedly assisted later arriving white customers. While waiting for approximately fifteen minutes, McKinney and two of his cousins tested several fragrance samples displayed on the counter. When the sales associate finally approached, she swept the samples away rather than offer any service. McKinney testified that the associate adopted a "rude . . . tone" which caused him to leave the store rather than attempt to proceed with a purchase.

Taking the facts in the light most favorable to McKinney, a genuine issue of fact exists as to whether the associate's behavior amounted to an outright refusal to serve McKinney. See Causey v. Sewell Cadillac-Chevrolet, Inc., 394 F.3d 285, 290 (5th Cir. 2004) ("[W]hen a merchant denies service or outright refuses to engage in business with a consumer attempting to contract with the merchant, that is a violation of § 1981."). It may be that the sales associate was too burdened by her other duties and customers to notice McKinney, but after fifteen minutes in which she made no offer of assistance nor gave even the slightest word of acknowledgment, a reasonable

jury could conclude that she had effectively decided not to serve him, particularly since she still made no offer of assistance when she finally approached him. A § 1981 plaintiff need not "wait indefinitely for . . . service when a reasonable person can conclude that no service is forthcoming. Indeed, in light of the clear illegality of outright refusal to serve, a [defendant] which wishes to discourage minority customers must resort to more subtle efforts to dissuade." Solomon v. Waffle House, Inc., 365 F. Supp. 2d 1312, 1324 (N.D. Ga. 2004). Summary judgment was therefore inappropriate.

Gregory, the Turners, and McKinney have each presented genuine issues of material fact both as to their good faith attempts to purchase merchandise at Dillard's and as to whether Dillard's obstructed or blocked their efforts to fulfill their intentions. Given that these plaintiffs are indisputably members of a protected class and given the evidence developed during discovery sufficient to show discriminatory intent, a reasonable jury could find for the plaintiffs on all four elements of a § 1981 claim. I would therefore reverse the district court's grant of summary judgment on the § 1981 claims of Crystal Gregory, Alberta and Carla Turner, and Jefferson McKinney and remand for further proceedings.

E.

The majority cites some statistics on the prevalence and cost of shoplifting, none of which are in the record. In fact Dillard's has never argued that African American customers are, for one reason or another, more prone to shoplift or that it has evidence on which it based its discriminatory use of the security code when blacks enter the Columbia store. But more importantly, the majority fundamentally misinterprets the balance struck by the political branches. Section 1981 does not prohibit retailers from implementing non race based security measures. Rather, the statute simply requires that whatever security measures a retailer undertakes must apply equally to customers of all races.

-48-

Although it explicitly acknowledges the offense that Dillard's alleged conduct caused the plaintiffs in this case, ante at 17, the majority appears to conclude that § 1981 tolerates a certain level of intentional discrimination. I submit that there is no basis for such conclusions either in established case law or in the history of § 1981. We all accept that federal judges ought not upset the policy judgments of elected officials, but the unmistakable intent of Congress cannot be ignored to "ensure that federal law prohibits all race discrimination in all phases of the contractual relationship." H.R. Rep. No. 102-40, pt. 1, at 92 (1991) (emphasis added). The legislative purpose is absolute and affords no shelter to demeaning or humiliating attempts to thwart African American customers as they attempt to exercise in good faith their right to make and enforce contracts.

The majority worries that deterring discriminatory conduct on the part of retail merchants may trigger additional litigation, including nonmeritorious claims. There is no doubt that "too broad a reading [of § 1981] would produce countless law suits based on minor or imagined discourtesies." Garrett, 295 F.3d at 107 (Boudin, J., concurring in part and dissenting in part). But as a practical matter, frivolous lawsuits are presently weeded out by the requirement that plaintiffs prove intentional discrimination, not that they prove a flagrant and outright refusal to deal. See Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391 (1982). The burden of proving intentional discrimination is a major impediment to prosecuting a § 1981 claim successfully. U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983) ("There will seldom be 'eyewitness' testimony as to the [defendant's] mental processes."). Yet the majority appears to hold that even when a plaintiff can provide evidence of discriminatory intent—and can therefore overcome this traditional obstacle to pursuing a claim—her cause will still fail unless she proves an absolute refusal to deal on the part of the merchant.

The majority mischaracterizes this dissent as lacking a "limiting principle on actionable interference," ante at 11, for the analysis presented here is firmly grounded

in the language of § 1981, its legislative history, and the established case law of the Supreme Court and of this and other circuits, including Domino's Pizza, Inc. v. McDonald, 546 U.S. 470 (2006), Rivers v. Roadway Express, Inc., 511 U.S. 298 (1994), Green v. Dillard's, Inc., 483 F.3d 533 (8th Cir. 2007), Bediako v. Stein Mart, Inc., 354 F.3d 835 (8th Cir. 2004), Barfield v. Commerce Bank, N.A.,484 F.3d 1276 (10th Cir. 2007), Williams v. Staples, 372 F.3d 662 (4th Cir. 2004), Garrett v. Tandy Corp., 295 F.3d 94 (1st Cir. 2002), Christian v. Wal-Mart Stores, Inc., 252 F.3d 862 (6th Cir. 2001), Hampton v. Dillard Deparment Stores, 247 F.3d 1091 (10th Cir. 2001), Watson v. Fraternal Order of Eagles, 915 F.2d 235 (6th Circ. 1990), and Hall v. Pennsylvania State Police, 570 F.2d 86 (3d Cir. 1978). Any successful § 1981 claim is of course limited by the plaintiff's ability to produce sufficient evidence to satisfy the four critical elements of the claim, including the difficult task of proving discriminatory intent.

This case may be unique for the evidence developed in support of the plaintiffs' claims that Dillard's intentionally discriminated against African American customers. The plaintiffs rely not only on their own experiences and impressions, but they have also uncovered testimony from former employees describing from the inside the discriminatory practices of management and personnel at the Columbia store. Such damaging testimony distinguishes these plaintiffs from those who might bring frivolous cases and strike suits in order to press nonmeritorious claims. We have here four African American plaintiffs who have produced substantial evidence of discriminatory intent, harassing treatment, and actionable interference with their intended purchases, interference which "as a whole thwarted their attempt to make and close a contract." Green, 483 F.3d at 539. If a retailer in these circumstances is immune from a § 1981 claim as a matter of law, then it is difficult to see what practical protection the statute is being afforded in the retail market.

# III.

The § 1981 claims of the nine remaining appellants—Treva Gage, Debra Hamilton, Capria Lee, Arnel Monroe, Michael Richmond, Maren Snell, Felicia Turner, Michael Warrick, and LaShanda Wisham—were all dismissed for failure to state a claim. See Fed. R. Civ. P. 12(b)(6). We review such dismissals de novo, Carter v. Arkansas, 392 F.3d 965, 968 (8th Cir. 2004), taking all facts alleged in the complaint to be true and construing the pleadings in the light most favorable to the plaintiffs. Particularly in civil rights cases the complaint should be liberally construed. Frey v. City of Herculaneum, 44 F.3d 667, 671 (8th Cir. 1995). The complaint need not follow any preestablished formula since there is no "rigid pleading requirement for discrimination cases." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002). Rather, the "simplified notice pleading standard," see Fed. R. Civ. P. 8(a), requires only that a complaint "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Id.

These plaintiffs' amended complaint satisfies this threshold. When its allegations are read in the light most favorable to the plaintiffs' claims, they adequately state facts supporting the four elements of a viable § 1981 claim: (1) that the plaintiffs are members of a protected class, (2) that Dillard's intentionally discriminated against them, (3) that they sought to exercise their rights to make and enforce contracts with Dillard's, and (4) that Dillard's interfered with that exercise. See Green, 483 F.3d at 538.

The first element is uncontroversial: the complaint clearly identifies each of the plaintiffs as African American. The complaint further alleges with respect to each plaintiff that Dillard's "engaged in unlawful discriminatory practice" and "exhibited a pattern and practice of discrimination against African Americans." These allegations reasonably put Dillard's on notice that the plaintiffs intended to prove intentional discrimination against minority customers, and the complaint therefore

-51-

satisfies the second element. The complaint also alleges that each plaintiff "sought to make and enforce a contract for services ordinarily provided by Dillard's, Inc." In particular, the plaintiffs were "denied the privileges of making shopping purchases." These allegations gave notice that the plaintiffs attempted to exercise their rights to make and enforce contracts by purchasing merchandise at Dillard's. The complaint therefore satisfies the third element. Finally, the complaint alleges that each plaintiff was "deprived of services while similarly situated persons outside the protected class were not," that each plaintiff "received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory," and that Dillard's "profil[ed], follow[ed], harass[ed], and engag[ed] in other acts designed to directly or indirectly refuse or withhold services" from the plaintiffs. These allegations gave notice as to the manner in which Dillard's had arguably interfered with the plaintiffs' protected interests. The complaint therefore satisfies the fourth and final element of a § 1981 claim.

The factual allegations are "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955 (2007). The complaint states how, when, and where Dillard's discriminated against the plaintiffs. It alleges that during the period from 1998 until the complaint was filed in 2004, these nine appellants "were followed and/or otherwise subjected to surveillance based upon their race" at the Dillard's store in Columbia, Missouri. The majority objects that this statement, taken alone, alleges nothing more than harmless surveillance or watchfulness. But when this particular allegation is construed in the context of the plaintiffs' other averments and viewed in the light most favorable to them, it is clear that it alleges more than "unadorned" surveillance. See Garrett, 295 F.3d at 101. Elsewhere in the complaint—and incorporated into each individual count by reference—the plaintiffs allege that they attempted to "mak[e] shopping purchases" but were effectively denied that privilege on account of, among other things, the defendant's "following, harassing, and engaging in other acts designed . . . to refuse or withhold services." (emphasis added).

-52-

Although the complaint is not as rich with detail as some might prefer, it need not be. Twombly, 127 S. Ct. at 1959 (holding detailed factual allegations are unnecessary). When the complaint is construed liberally, as it must be, Frey, 44 F.3d at 671, it clearly states that between 1998 and 2004 the plaintiffs attempted to make purchases at the Columbia Dillard's but were followed, harassed, and otherwise denied the opportunity to complete their transactions because of the defendant's alleged policy and practice of racial discrimination. That was enough to state a claim under § 1981 and to afford Dillard's adequate notice under Rule 8(a)'s simplified notice pleading standard. I would therefore reinstate the claims of these nine appellants and remand for further proceedings.

IV.

Section 1981 was originally enacted almost 150 years ago to guarantee to African Americans the right of equal treatment during the course of negotiating, consummating, performing, and enforcing contractual duties. Its purpose was reaffirmed in 1991 when Congress explicitly overturned the Supreme Court's restrictive interpretation of the statute in Patterson and chose to define § 1981's coverage to include the terms and conditions under which contracts are negotiated and formed. The majority turns the settled intent of Congress on its head by holding that intentional discrimination which is demeaning or humiliating is nevertheless tolerable under § 1981 even if it thwarts the exercise of protected rights. This cannot be reconciled with the statute's plain instruction that African Americans must be guaranteed "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981 (emphasis added). As the Third Circuit has noted, a commercial establishment violates § 1981 rights when it "offer[s] its services under different terms dependent on race." Hall v. Pa. State Police, 570 F.2d 86, 92 (3d Cir. 1978).

The extensive factual record developed during discovery revealed that store personnel at the Columbia Dillard's regularly broadcast a security code whenever African Americans entered the store. Evidence was uncovered that the Columbia Dillard's maintained a customary practice of targeting African Americans for harassing behavior, intimidation, and sometimes outright refusals of service which thwarted, frustrated, or blocked the plaintiffs from the exercise of their § 1981 rights. See Green, 483 F.3d 539.[20] The summary judgment plaintiffs produced issues of material fact, and their § 1981 claims should not have been dismissed on summary judgment but tried by a fact finder. Further, each of those dismissed under Rule 12(b)(6) has alleged intentional race based discrimination which interfered with the exercise of protected contractual interests. Their allegations are to be construed liberally and were sufficient under the rule of Twombly. Dillard's was not entitled to judgment as a matter of law.

For these reasons I respectfully dissent.

———————————————

[20]"Thwart" is defined by a recognized dictionary as "to prevent from taking place; frustrate; block." American Heritage Dictionary 1343 (New College Ed. 1976).