# United States Court of Appeals

### For the Eighth Circuit

_____

No. 15-3265

_____

Dante A.R. Combs, individually and on behalf of all others similarly situated;
Adam S. Williams, individually and on behalf of others similarly situated

*Plaintiffs - Appellants*

v.

The Cordish Companies, Inc.; Lounge KC, LLC, doing business as Mosaic;
Entertainment Concepts Investors, LLC; First Response, Inc.; Entertainment
Consulting International, LLC

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: November 15, 2016
Filed: July 5, 2017

_____

Before RILEY,[1] WOLLMAN and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

_____

[1]The Honorable William Jay Riley stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 10, 2017. He has been succeeded by the Honorable Lavenski R. Smith.

Dante A.R. Combs and Adam S. Williams, on behalf of themselves individually and others similarly situated, brought a race discrimination lawsuit against several entities associated with the Power & Light Entertainment District (the District) in Kansas City, Missouri. The lawsuit alleged the defendants engaged in a pattern and practice of racial discrimination that interfered with the ability of African American men to patronize bar and restaurant establishments in the District, in violation of 42 U.S.C. § 1981. The district court granted summary judgment to all defendants and Combs and Williams appeal. For the reasons discussed below, we affirm in part, and reverse and remand in part.

## I. Background

Combs and Williams are African American men who allege they have personally suffered racial discrimination in the District. The Cordish Companies (Cordish) developed the District.[2] The District began operations in November 2007, and Cordish continues to oversee at least some of its operations.[3] From 2009 to 2012,

---

[2]Entertainment Concepts Investors, LLC, and Entertainment Consulting International, LLC (collectively, ECI) are Maryland limited liability companies, and are defendants in this case. Although Combs and Williams allege ECI functions as a "holding company" for other Cordish entities, they do not further explain how these companies are related to the District. Lounge KC, LLC (Lounge KC) is a Missouri company that operates Mosaic Ultra Lounge (Mosaic). All four entities filed collectively for summary judgment in the district court, and they continue to act jointly on appeal. Only one claim has been alleged against Lounge KC, however, while Cordish and ECI are named in connection with all alleged claims. For these reasons, we refer to Cordish and ECI as Cordish, unless the circumstances otherwise require clarification, and we refer to Lounge KC separately.

[3]In the First Amended Complaint (Complaint), Combs and Williams allege Cordish "and/or its subsidiaries own, operate and/or lease all of the property located in the [District]." Cordish denied this in its Answer, but on appeal, Cordish does not dispute the description of its or its subsidiaries' role in the District generally, and in

-2-

managers of District establishments reported to Cordish, as well as to their individual employers. First Response, Inc. (First Response) is a Kansas corporation that provided security in the District between December 2010, and October 2014.

The District covers eight blocks in downtown Kansas City, Missouri, and is comprised of entertainment, dining, and shopping venues. The LiveBlock, a one-block enclosed area in the District, contains a number of bars, restaurants, and nightclubs, and has a common covered patio space called the "Living Room." To get to one of the establishments surrounding the Living Room, a patron first goes through an entrance into the LiveBlock. From there the patron can enter an individual establishment of choice through that establishment's entrance. Security at the entrance to the LiveBlock ensures patrons are 21 years old and are abiding by the dress code and other rules. The individual establishments also have their own security (bouncers).[4] In their Complaint, Combs and Williams assert they were targeted for ejection from the LiveBlock on account of their race when they were at, near, or trying to patronize three establishments bordering the Living Room: the Maker's Mark Restaurant (Maker's Mark), Mosaic, and Tengo Sed Cantina (Tengo).[5]

The first incident occurred at Maker's Mark on August 26, 2010. Williams was at Maker's Mark with a group of friends, including Combs.[6] At some point, Williams

the enclosed space referred to as the "Kansas City Live! Block," (LiveBlock) in particular, as proffered by Combs and Williams in their briefing. We will therefore consider these descriptions true for purposes of appeal.

[4]To differentiate between security provided at the entrance to the LiveBlock and security at the individual establishments, we refer to the security at the individual establishments as "bouncers."

[5]The owners of Maker's Mark and Tengo are not defendants in this action.

[6]Although Combs also brought a claim based on this incident, he does not appeal the court's grant of summary judgment as to him.

was approached by another Maker's Mark patron, Cail Hendry. According to Combs and Williams, Hendry made offensive remarks to Williams. An altercation broke out among Hendry, Williams, and other patrons of the bar, and Maker's Mark bouncers stepped in, followed by security guards. Both Williams and Hendry were handcuffed, separated, and detained. Hendry was released after fifteen or twenty minutes of questioning and then allowed to return to Maker's Mark. Williams was detained for approximately ninety minutes before he was allowed back into Maker's Mark to pay his tab. Williams was then escorted out of the LiveBlock. Williams alleges that Hendry was paid by Cordish to pick a fight with him so that security would eject him from the LiveBlock.

The second incident occurred at Mosaic in early summer 2011. As Combs stood in line to enter Mosaic, he was asked for identification, while others in line in front of him—who were not African American—were not. As Combs got closer to the entrance, a bouncer asked him to step to the side of the line. Combs asked why he had to leave the line, but he was ignored for several minutes while Mosaic employees admitted several small clusters of people who arrived after him. Combs asked again why he was not being allowed into Mosaic. The exchange became "heated," and the bouncer told Combs he was being denied entrance because his "pants are too f***ing baggy." Combs did not believe this reason because he was dressed in a tailored suit, and he asked to speak to the manager. No manager was called, and Combs was not allowed into Mosaic. Eventually, security guards arrived, asked "what the problem was," and escorted Combs out of the LiveBlock.

The third incident occurred in July 2011. Combs had entered the LiveBlock to meet friends that he believed were at Tengo.[7] He was running late, so he stopped

---

[7]Combs asserts he intended to patronize Tengo, or whichever establishment his friends had chosen for the evening. For simplicity, we refer to this as the Tengo incident.

-4-

approximately thirty feet from the front door to text them to find out if they were still there. While he was texting, a man walked up and knocked Combs' cellphone out of his hand. Then, the man was "right in [Combs'] face," yelling obscenities. Security guards arrived and escorted Combs out of the LiveBlock, and "nobody wanted to listen to [Combs'] story" as to what had just happened. Combs did not know what, if anything, happened to the other person.

In April 2011, Combs and his wife filed a voluntary Chapter 7 petition for bankruptcy relief. It is undisputed that Schedule B of his bankruptcy petition asked Combs to list his "contingent and unliquidated claims of every nature," and that he did not disclose any potential lawsuits he might have against any of the defendants. Combs and his wife received their discharge in August 2011, and the case was closed.

In March 2014, after hearing media reports of racial discrimination at the District, Combs and Williams brought the instant action, based on the three incidents described above. Williams alleged Cordish and the security company, First Response, intentionally interfered with his right to patronize Maker's Mark because of his race. Combs alleged that all defendants violated his right to patronize Mosaic, and that Cordish and First Response violated his right to patronize Tengo (or any other establishment in the LiveBlock), both times on account of his race. All the defendants filed motions for summary judgment on the merits. Cordish and Lounge KC also asked the court to find Combs was judicially estopped from pursuing his claims because he did not disclose them in his bankruptcy proceeding. Combs then moved to reopen his bankruptcy to amend his petition.

Before the bankruptcy court ruled on Combs' motion to reopen, the district court granted summary judgment to all defendants.[8] The court concluded that Combs

---

[8]The District Court sua sponte found Combs' claims against First Response barred by the doctrine of judicial estoppel. On appeal, First Response takes no

-5-

was "judicially estopped from asserting claims that he had before he filed for bankruptcy relief, as well as claims that arose while his bankruptcy was pending and before he was granted a discharge of his debts." In the alternative, the court granted summary judgment in favor of all defendants on the merits on all claims by both Williams and Combs with one exception: Combs' allegation against Lounge KC regarding the incident at Mosaic. As to Lounge KC, the court found there were disputed issues of material fact as to whether Mosaic employees interfered with Combs' right to enter, but nonetheless found judicial estoppel barred relief.

The day after the district court entered judgment, the bankruptcy court granted Combs' motion to reopen the Chapter 7 bankruptcy proceeding and allowed the lawsuit against the defendants to be listed as a contingent claim on Combs' list of personal property in Schedule B. The bankruptcy court considered only the Maker's Mark incident to be an asset of the Chapter 7 estate, and the Trustee indicated his intent to abandon the claim. The district court denied Combs' post-judgment motion to amend or alter judgment based on the bankruptcy court's decision.[9]

---

position regarding the judicial estoppel issue.

[9]Because Combs has not presented any meaningful argument regarding the denial of his post-judgment motion in his opening brief, his challenge to the denial is waived. See Chay-Velasquez v. Ashcroft, 367 F.3d 751, 756 (8th Cir. 2004) ("Since there was no meaningful argument on this claim in his opening brief, it is waived."). In addition, "[i]n reviewing the grant of summary judgment, we 'consider only evidentiary materials that were before the trial court at the time the summary judgment ruling was made.'" U.S. ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5, 688 F.3d 410, 413 (8th Cir. 2012) (quoting Barry v. Barry, 78 F.3d 375, 379 (8th Cir. 1996)).

## II. Discussion

On appeal, Combs asserts the district court abused its discretion in applying judicial estoppel to bar his claims. Combs and Williams both assert that the court erred in granting summary judgment on the merits.

## A. Judicial Estoppel

Our review of a district court's application of the judicial estoppel doctrine is for abuse of discretion. We will affirm "unless it plainly appears that the court committed a clear error of judgment in the conclusion it reached upon a weighing of the proper factors." Jones v. Bob Evans Farms, Inc., 811 F.3d 1030, 1032 (8th Cir. 2016) (quoting Stallings v. Hussmann Corp., 447 F.3d 1041, 1046–47 (8th Cir. 2006)). A district court abuses its discretion if its judgment "was based on clearly erroneous factual findings or erroneous legal conclusions." Lopez v. United States, 790 F.3d 867, 871 (8th Cir. 2015) (quoting Chapa v. United States, 497 F.3d 883, 887 (8th Cir. 2007)).

Judicial estoppel is an equitable doctrine that "protects the integrity of the judicial process." Stallings, 447 F.3d at 1047 (internal quotation omitted). It prohibits a party who takes one position in a legal proceeding, "and succeeds in maintaining that position," from then assuming a contrary position "simply because his interests have changed." Id. (quoting New Hampshire v. Maine, 532 U.S. 742, 748 (2001)). In deciding whether judicial estoppel is appropriate, courts consider three non-exhaustive factors: "(1) whether the party's later position is 'clearly inconsistent' with its prior position; (2) whether a court was persuaded to accept a prior position 'so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled'; and (3) whether the party claiming inconsistent positions 'would derive an unfair advantage or impose an

unfair detriment on the opposing party if not stopped.'" Smith v. AS Am., Inc., 829 F.3d 616, 624 (8th Cir. 2016) (quoting New Hampshire, 532 U.S. at 750).

On appeal, Combs argues he cannot be faulted for failing to list his claims arising from the incidents at Mosaic and Tengo as assets in his Chapter 7 bankruptcy petition because those incidents happened after he filed for bankruptcy and so, as a matter of law, those claims were not assets of the estate at the time of filing. As such, his failure to disclose those claims was not a representation that he had no claim, and thus he did not take an inconsistent position by not listing them. Combs did not raise this argument in response to the motions for summary judgment at the district court.

"Ordinarily, we will not consider an argument raised for the first time on appeal." United States v. Hirani, 824 F.3d 741, 751 (8th Cir. 2016). But we have discretion to consider a newly raised argument "if it is purely legal and requires no additional factual development, or if a manifest injustice would otherwise result." Id. (quoting Peter Kiewit Sons', Inc. v. Wall St. Equity Grp., Inc., 809 F.3d 1018, 1022 (8th Cir. 2016)). Whether Combs' causes of action based on the Mosaic and Tengo incidents were assets in Combs' Chapter 7 bankruptcy is a purely legal issue that requires no further factual development, so we exercise our discretion to address it.

The Bankruptcy Code offers individual debtors two options to gain discharge of their financial obligations: a Chapter 7 or a Chapter 13 bankruptcy proceeding. Harris v. Viegelahn, 135 S. Ct. 1829, 1835 (2015). Chapter 7 and Chapter 13 work differently. Id. The property of a Chapter 7 estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case," including causes of action. In re Senior Cottages of Am., LLC, 482 F.3d 997, 1001 (8th Cir. 2007) (quoting 11 U.S.C. § 541(a)(1)). But "a Chapter 7 estate does not include . . . the assets [a debtor] acquires *after* the bankruptcy filing." Harris, 135 S. Ct. at 1835 (citing 11 U.S.C. § 541(a)(1)). Here, there is no dispute that the Mosaic and Tengo incidents occurred after Combs filed his Chapter 7 bankruptcy. A claim

under 42 U.S.C. § 1981 accrues at the "time of the *discriminatory act*." Chardon v. Fernandez, 454 U.S. 6, 8 (1981) (per curiam). Any cause of action based on the Mosaic and Tengo incidents was therefore not property of Combs' Chapter 7 estate. Accordingly, Combs' subsequent filing of his § 1981 action based on these incidents was not inconsistent with his position in bankruptcy court. Further, because those claims were not property of the Chapter 7 estate, neither the bankruptcy court nor the district court was misled by Combs' omission of those claims on the bankruptcy schedules, and Combs did not derive an unfair advantage over any opposing party by not listing the claims.

Cordish and Lounge KC urge us to affirm the district court's ruling. They assert that after the Supreme Court's 2001 decision in New Hampshire v. Maine, we have repeatedly affirmed the application of judicial estoppel to plaintiffs who failed to disclose existing or potential causes of action as assets in their bankruptcy cases. See Van Horn v. Martin, 812 F.3d 1180, 1182–83 (8th Cir. 2016); Jones, 811 F.3d at 1033–34; EEOC v. CRST Van Expedited, Inc., 679 F.3d 657, 677–80 (8th Cir. 2012). But reliance on these cases is misplaced. Two of these cases involve Chapter 13, not Chapter 7, bankruptcy filings. See Van Horn, 812 F.3d at 1182–83 (affirming district court's application of judicial estoppel to plaintiff "who failed to amend her Chapter 13 bankruptcy schedules to include her employment discrimination lawsuit which arose during the pendency of her bankruptcy proceedings . . . because all three estoppel factors supported its application"); Jones, 811 F.3d at 1033 (same). Unlike a Chapter 7 bankruptcy, a Chapter 13 estate includes not only the property the debtor had at the time of filing, but also wages and property acquired after filing but before discharge. Harris, 135 S.Ct. at 1835 (citing 11 U.S.C. § 1306(a)). Thus, if a debtor obtains property during the pendency of a Chapter 13 bankruptcy, the debtor may be required to amend the Chapter 13 schedules. Id. The same requirement does not apply to Chapter 7. Id.

The third case, EEOC v. CRST, is also distinguishable. In CRST, the Equal Employment Opportunity Commission (EEOC) filed "a sweeping employment-discrimination suit . . . against CRST, one of the country's largest interstate trucking companies, . . . alleg[ing] that CRST was responsible for severe and pervasive sexual harassment in its New–Driver Training Program." CRST, 679 F.3d at 665. We addressed judicial estoppel as it applied to two claimants. One claimant had filed Chapter 13 bankruptcy, and we upheld application of judicial estoppel to her claim because she was "obliged to amend her petition to disclose her involvement or potential involvement in the post-petition lawsuit." Id. at 680 (citing Stallings, 447 F.3d at 1148). The other claimant and her husband "filed their joint [Chapter 7 bankruptcy] petition an entire year after the EEOC instituted suit in this matter, indicating, at the very least, that they had notice of [her] potential claim." Id. We concluded that the district court did not abuse its discretion in judicially estopping either of these claimants from individually pursuing her claim against CRST for sexual harassment. Here, in contrast, the incidents upon which Combs relies in bringing his § 1981 lawsuit did not occur until after he filed his Chapter 7 bankruptcy. Unlike the claimant in CRST, Combs did not have notice of a potential claim in connection with the Mosaic or Tengo incidents because the conduct underlying these claims had not yet occurred. We conclude the district court's ruling was based on an erroneous legal conclusion, and thus it was an abuse of discretion to apply judicial estoppel to Combs' claims involving Mosaic and Tengo.[10] We proceed to address the merits of Combs' claims.

---

[10]Combs also argues his failure to list his potential causes of action as assets was inadvertent, mistaken, and in good faith and that the bankruptcy trustee's abandonment of the claims to him obviated two of the three necessary factors for judicial estoppel. Because we decide the issue on different grounds, we need not address these arguments. See Bank of Am., N.A. v. JB Hanna, LLC, 766 F.3d 841, 854 (8th Cir. 2014).

**B. Merits**

We review de novo a district court's decision to grant summary judgment. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). "We consider the evidence in the light most favorable to [Combs and Williams], making all reasonable inferences in [their] favor." McLean v. Gordon, 548 F.3d 613, 616 (8th Cir. 2008). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Torgerson, 643 F.3d at 1042 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).

Under 42 U.S.C. § 1981, all persons within the jurisdiction of the United States shall have "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). This includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. § 1981(b). Because § 1981 "does not provide a general cause of action for race discrimination, . . . [a]ny claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship' under which the plaintiff has rights." Gregory v. Dillard's, Inc., 565 F.3d 464, 468–69 (8th Cir. 2009) (en banc) (internal quotations and citations omitted). Section 1981 does not apply only to existing contractual relationships; it "protects the would-be contractor along with those who already have made contracts." Withers v. Dick's Sporting Goods, Inc., 636 F.3d 958, 963 (8th Cir. 2011) (quoting Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476 (2006)). "[It] offers relief 'when racial discrimination blocks the creation of a contractual relationship' that does not yet exist." Id. (quoting Domino's Pizza, 546 U.S. at 476).

-11-

To prevail on a § 1981 claim, a plaintiff must show: "(1) membership in a protected class, (2) discriminatory intent on the part of the defendant, (3) engagement in a protected activity, and (4) interference with that activity by the defendant." Gregory, 565 F.3d at 469. Intentional race discrimination may be proven by either direct or circumstantial evidence. Putman v. Unity Health Sys., 348 F.3d 732, 734 (8th Cir. 2003). On appeal, Combs and Williams assert the district court erred by not viewing both the direct and circumstantial evidence they presented in the light most favorable to them.

### i. Maker's Mark Incident

The district court found that Adam Williams is a member of a protected class who was engaged in protected activity when he was at Maker's Mark in August 2010. It concluded, however, that the evidence showed Williams was ejected not because of his race, but because he was involved in a bar fight. Williams argues there is substantial evidence to support a finding of intentional race discrimination in connection with the Maker's Mark incident based on what he describes as a pervasive, ongoing effort on the part of Cordish to keep African American men from frequenting the bars and restaurants in the LiveBlock.

Glen Cusimano testified about one particular aspect of this purportedly pervasive effort: the "rabbit" scheme. Cusimano worked in the District from 2009 to 2013. He first worked in the LiveBlock in 2010, and eventually became Security Liaison, coordinating security for the entire District and reporting directly to Cordish. He also worked as the general manager of Angels Rock Bar, Mosaic, and Club Hotel.[11] Jake Miller, the Senior Vice President of ECI, regularly came to oversee the running

_____

[11]Neither party directs us to anything in the record that establishes when Cusimano held these various positions, but according to Cusimano, he reported to Jake Miller in all three general manager positions.

of the LiveBlock. According to Cusimano, the managers of every establishment in the LiveBlock, as well as security, reported to Miller. In the summer of 2012, Miller ordered Cusimano to recruit white men to start arguments with African American patrons in and around the Living Room in exchange for free drinks and cash. The code word Miller used for these men was "rabbit." When trouble began, security would eject the African American patrons, while the rabbit would slip away and then return through another entrance.

Williams also offered the testimony of someone who said he worked as a rabbit in the LiveBlock. Thomas Alexitch, a white male, was recruited by Cusimano in July 2012 to get rid of "undesirables" in the LiveBlock area. According to Alexitch, "90% of the people" he was ordered to target "were African Americans." Alexitch claimed he would be directed toward specific patrons. He would start verbal altercations with the targets by making personal comments or sitting in a target's chair when the target stood up. He did not, however, engage in physical contact. Instead, the interaction would go until "the point of when you're going to fight" and then security would step in to eject the targets, without handcuffing anyone. After instigating an altercation, Alexitch would also be escorted out of the LiveBlock, but, unlike the target, he would walk away from security only to be allowed to return through a different entrance. Alexitch received free drinks and cash for his work as a rabbit.

Cusimano testified that Miller taught him additional techniques Cordish used in other cities to exclude or eject African American patrons from Cordish-operated areas. These techniques included not allowing potential patrons to enter a club because they were in violation of the dress code, even though they were not; having bouncers question African American men who wanted to enter a club while allowing others to enter without question, and then ejecting the African American patron if he argued or responded with anger or aggression; and telling African American men who wanted to enter a club that the club was overbooked or reserved for an event, when it was not. Cusimano testified that he had personally observed that in tense situations

-13-

involving both white and African American patrons, only the African American patrons would be ejected.

Williams also offered a declaration from Garron Williams, an African American man who worked as a security guard monitoring the main entrances to the LiveBlock from 2009 until the summer of 2011. As a security guard, he personally observed First Response eject patrons from the Living Room, the vast majority of whom were African American. He testified that "it was clear" to him that the dress code was crafted to exclude African Americans.[12] Garron Williams also testified that he saw what he believed to be a rabbit at work. He and two African American friends were patrons at a bar in the District. A white man who appeared drunk stumbled into him and his friends. When the man did not get a rise out of them, he walked clumsily over to the only other African American group in the bar and fell into one of the men. When the man and his group stood up, First Response security guards came in, removed the African Americans, and left the white man, who no longer acted drunk and walked away as if nothing had happened. Williams did not identify when this incident occurred, only that it occurred when he was not working, and he did not identify the bar as one owned or managed by Cordish.

Adam Williams asserts that this additional evidence is sufficient to support a finding that he was the target of a rabbit scheme, a racially motivated effort to prevent him from remaining at Maker's Mark in August 2010. Viewing the evidence in the light most favorable to Williams, it would be difficult to conclude that he and Combs did not submit evidence of racially discriminatory tactics, schemes, and patterns at the LiveBlock. The evidence in this regard is unsettling to say the least. In this lawsuit,

---

[12]On one occasion, he saw Jake Miller take a photograph of a young African American man near the entrance to the Living Room. Shortly thereafter, according to Williams, the dress code was modified "to ban what this young black man was wearing."

however, the question before the court is whether Williams has presented sufficient evidence to demonstrate that he was a victim of the rabbit scheme as alleged. Without diminishing the disturbing nature of the evidence generally, and still viewing the facts in the light most favorable to Williams, we nevertheless agree with the district court that Williams has failed to do so.

The district court found insufficient evidence to support Williams' theory that Hendry, the person who started the fight at Maker's Mark, did so on behalf of the defendants. The circumstances of the Maker's Mark incident do not match what is described as the rabbit scheme. Cusimano and Alexitch testified that a rabbit worked alone. Hendry was with his girlfriend and a group of friends that night. In the case of a rabbit, security would "swoop in" and eject the entire group of African Americans. Here, both Hendry and Williams were handcuffed, removed, and interviewed. Combs was allowed to stay. There is also a problem of timing. It was not until the summer of 2012 that Miller told Cusimano to employ the rabbit scheme. Similarly, Alexitch, the only witness who identified himself as a rabbit, did not work as one until July 2012. There is no evidence a rabbit was used at the LiveBlock prior to this date. While there is evidence that Cordish directed individuals to instigate fights in an effort to remove African Americans from the LiveBlock—an obviously discriminatory tactic—the district court did not err in concluding that Williams presented insufficient evidence to show that he was a target of such efforts at Maker's Mark in August 2010.

### ii. Tengo Incident

Combs claims Cordish and First Response interfered with his right to enter one of the establishments in the LiveBlock in July 2011. He too relies on the testimony of Cusimano, Alexitch, and Garron Williams to establish that the white man who knocked his cellphone out of his hand outside Tengo was a rabbit hired by Cordish. The district court concluded that this claim could not proceed for two reasons: (1)

-15-

Combs failed to demonstrate he was engaged in a protected activity at the time and (2) Combs presented no evidence that defendants interfered with his ability to contract.

Combs contends the district court erred in applying a "retail transaction" analysis, rather than a restaurant or night club analysis, to find he was not engaged in protected activity. Compare Gregory, 565 F.3d at 470 ("In view of the statute's focus on protecting a contractual relationship, a shopper advancing a claim under § 1981 must show an attempt to purchase, involving a specific intent to purchase an item, and a step toward completing that purchase." (citing Green v. Dillard's, Inc., 483 F.3d 533, 538 (8th Cir. 2007))), with Arguello v. Conoco, Inc., 330 F.3d 355, 360 (5th Cir. 2003) (for purposes of § 1981, "dining at a restaurant generally involves a contractual relationship that continues over the course of the meal and entitles the customer to benefits in addition to the meal purchased"). See also 42 U.S.C. § 1981(b) ("[T]he term 'make and enforce contracts' includes . . . the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."). Combs does not identify the contractual relationship he believes the district court overlooked, but seems to assert he was engaged in protected activity once he entered the LiveBlock, without the need to show a specific intent to enter a particular establishment inside the LiveBlock. Because Cordish controls the entrance into the LiveBlock, the argument seems to go, it thus controls whether a person can enter any of the establishments inside; and entrance into the LiveBlock is the start of a contractual relationship that continues over the course of the patron's time in the LiveBlock.

We do not have to decide whether Combs was engaged in protected activity once he entered the LiveBlock—a question on which the parties have presented scant evidence or argument—because we conclude the district court properly found that Combs failed to offer sufficient evidence to support a finding that he was a target of the rabbit scheme. Combs asserts that what happened to him precisely fit the described rabbit scheme: a young white male purposefully starting a pretextual altercation with an African American man, upon which security ejects the African

-16-

American man from the LiveBlock. Although the man who knocked Combs' cell phone out of his hand was white, however, the incident does not otherwise resemble the alleged discriminatory practice. According to Alexitch, the rabbit scheme was generally employed to eject groups of African Americans, not single individuals. According to Cusimano, "the rabbit would be told to hang around people we wanted to eject from the Living Room, and then start an argument with them." Combs had just entered the LiveBlock. Combs saw security talking to the unknown man, but he did not know what happened to the man or whether he was also escorted out. Finally, this incident occurred in July 2011. There is evidence in the record to support a finding of other discriminatory tactics aimed to limit the number of African American men at the LiveBlock in July 2011, but no evidence of the particular tactic called the rabbit scheme. As with the Maker's Mark incident, the question is not whether Combs has presented evidence of discriminatory conduct on the part of defendants at the LiveBlock. The question is whether he has shown evidence that he personally was the target of a rabbit scheme in July 2011 that is sufficient to overcome summary judgment. We agree with the district court that he has not.

### iii. Mosaic Incident

We note first that the district court concluded that, but for Combs being judicially estopped from bringing his claims, he had raised a genuine issue for trial against Lounge KC, the owner of Mosaic, in regard to the Mosaic incident. Lounge KC has not appealed the court's finding on this issue. Given our ruling on judicial estoppel, we affirm the district court's alternative holding.

The district court dismissed the claims against Cordish in connection with the Mosaic incident because it concluded Combs had not provided any evidence connecting those defendants to Combs being denied admittance to Mosaic. As noted, however, Combs presented evidence regarding the tactics Cordish used to exclude African Americans from LiveBlock establishments, including Mosaic. These tactics

included denying African American men entrance to clubs because of alleged dress code violations and singling out African American men in line for clubs for additional questioning. One of the jobs Cusimano held at the LiveBlock was general manager of Mosaic, and he reported to Cordish. According to Cusimano, these tactics—as distinct from the rabbit scheme—started as early as 2009, when Jake Miller first described them to Cusimano. Viewed in the light most favorable to Combs, he has presented sufficient evidence to create a genuine issue of material fact as to whether Cordish played a role in excluding him from Mosaic.

Combs also asserts the district court erred in granting summary judgment to First Response in connection with this incident. The court concluded First Response was not liable for this incident because by the time the security guards came onto the scene, Combs had already been denied admittance to Mosaic. In addition, we note that Combs failed to identify which company employed the security guards who ejected him. Cusimano testified that, as Security Liaison, he coordinated the security for the District, and that First Response was one of several entities who provided security services. Because Combs was unable to establish that First Response employed the security guards who escorted him out of the LiveBlock, summary judgment was appropriately granted to First Response.

### III. Conclusion

For the reasons set forth above, we affirm the district court's grant of summary judgment on Williams' Maker's Mark claim, Combs' Tengo claim, and Combs' claim against First Response with respect to the Mosaic incident. We affirm the district court's alternative holding denying summary judgment on Combs' claim against Lounge KC and reverse the district court's grant of summary judgment on Combs'

-18-

Mosaic claim against Cordish. We remand for trial Combs' claim against Lounge KC and Cordish[13] with respect to the Mosaic incident.

_____

---

[13]"Cordish" includes ECI. <u>See</u> fn. 2, supra.